C.F. TRUST, INC., et al., Plaintiffs,

v.

**FIRST FLIGHT LIMITED PARTNERSHIP, et al.,** Defendants.

No. CIV.A. 99–1742–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 22, 2001.

As Amended April 26, 2000.

Thomas Lawrence Albert, Birch, Horton, Bittner & Cherot, Washington, DC, James Robert Schroll, Bean, Kinney & Korman, P.C., Arlington, VA, for Plaintiffs.

Russell James Gaspar, Cohen Mohr L.L.P., Washington, DC, James Thomas Bacon, Allred, Bacon, Halfhill, Landau & Young, P.C., Fairfax, VA, for Defendants.

1. *See infra* ¶ 13.

2. Plaintiffs' motion was denied. Defendants' motion was granted as to Nancy Peterson and

### MEMORANDUM OPINION

ELLIS, District Judge.

This action is plaintiffs' latest attempt in a seven year effort to collect in full the more than $8 million in judgments they hold against defendant Barrie Peterson. After pursuing the full range of conventional collection remedies [1]—largely unsuccessfully—plaintiffs brought this action against Barrie Peterson and various of his entities (i) alleging that Peterson used his various corporations and partnerships as alter egos to avoid payment of his obligations under the judgments and (ii) seeking to pierce the corporate veil in reverse to reach the assets of these entities. A four-day Bench trial followed the completion of discovery and disposition of the parties' cross-motions for summary judgment.[2] This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed. R.Civ.P.

### FINDINGS OF FACT

#### I. *Parties, Related Entities, and Background of Dispute*

1. C.F. Trust is a Florida corporation with its principal place of business in Florida. C.F. Trust owns two commercial notes (the "CF Notes") dated November 1, 1993 on which Barrie Peterson individually, Barrie Peterson, Trustee, and Nancy Peterson are personally liable in the total original principal amount of $6,064,903.57. Following an event of default, C.F. Trust obtained a judgment, entered on February 1, 1996 against Barrie Peterson individually, Barrie Peterson, Trustee, and Nancy Peterson jointly and severally on their endorsements of the CF Notes, in the total original principal amount of $6,117,813 plus

Scott Peterson, but was denied in all other respects. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership,* 111 F.Supp.2d 734 (E.D.Va. 2000); *infra* ¶ 14 n. 7.

post-judgment interest at the rate of 9% per annum. *See C.F. Trust, Inc. v. Peterson,* Law No. 39433 (Prince William County Cir. Ct. Feb. 1, 1996). C.F. Trust also has a charging order dated September 8, 1998, as corrected September 28, 1998, charging the entire partnership interests of the Petersons in, *inter alia,* First Flight Limited Partnership ("First Flight"), PVD Limited Partnership ("PVD"), and Occoquan Limited Partnership ("Occoquan") with payment of the CF Judgments. *See C.F. Trust, Inc. v. Peterson,* Order, Civ. A. Nos. 96–264–A, 96–265–A (E.D.Va. Sept. 28, 1998). Pursuant to this charging order, the Petersons are required "to take all available steps to cause the Specified Partnerships to comply with their duties under this Charging Order."

2. Atlantic Funding Corporation ("Atlantic Funding") is a Nevada corporation with its principal place of business in Florida. Atlantic Funding owns a Note (the "AFC Note") on which Barrie Peterson individually and as Trustee is liable in the total original principal amount of $1,000,000. Atlantic Funding also has a judgment, entered November 15, 1991, against Barrie Peterson individually and as Trustee, on the AFC Note in the total principal amount of $1,217,201.96 plus interest. *See Resolution Trust Corp. v. Peterson,* Order, Civ. A. No. 91–1084–A (E.D.Va. Nov. 15, 1991). Atlantic Funding has also obtained two charging orders on its judgment from the Prince William County Circuit Court, one dated March 1, 1996 charging the partnership interest of Barrie Peterson in First Flight and another dated March 15, 1996 charging Barrie Peterson's partnership interest in PVD. *See Atlantic Funding Corp. v. Peterson,* Chancery No. 39647 (Prince William County Cir. Ct. Mar. 15, 1996); *Atlantic Funding Corp. v. Peterson,* Chancery No. 39459 (Prince William County Cir. Ct. Mar. 1, 1996).

3. Defendant Barrie Peterson is an individual residing in Fairfax, Virginia.

4. Nancy Peterson, a resident of Fairfax, Virginia, is the wife of Barrie Peterson.

5. Scott Peterson, a resident of Fairfax, Virginia, is Barrie Peterson's son.

6. Defendant First Flight is a limited partnership with its principal place of business in Woodbridge, Virginia. Barrie Peterson and Scott Peterson each hold a 49% limited partnership interest in First Flight. The general partner is the Upland Group, a corporation wholly owned and controlled by Scott Peterson.[3] First Flight owns and operates a commercial/industrial rental property in Hagerstown, Maryland, known as the Top Flight Airpark. Top Flight Airpark consists of a building of approximately 1 million square feet in size, located on 55 acres near the Hagerstown Airport. Space in the building is leased to approximately 15–20 tenants. First Flight employs approximately 12 people at the Airpark, including a secretary/office manager, roofers, and maintenance and security personnel. Barrie Peterson used First Flight funds to pay his personal expenses directly and indirectly through distributions to Scott Peterson and payments to Birchwood Holdings Group ("BHG"). *See infra* ¶¶ 19–21, 27.

7. BHG is a corporation organized under the laws of Virginia and has its principal place of business in Woodbridge, Virginia. Until June 2000, when BHG was sold to Atlantic Funding at a judicial sale, it was wholly owned by Barrie Peterson.[4]

---

**3.** For further details of the history of ownership and control of First Flight, *see infra* ¶¶ 15–20.

**4.** By Order dated June 19, 2000, plaintiff Atlantic Funding, became the sole owner of BHG and Birchwood Organizations Inc. *See Atlantic Funding Corp. v. Peterson,* Order, Civ-

BHG provided administrative and management services, chiefly to other Barrie Peterson-controlled entities. Also, BHG was one of the Barrie Peterson controlled entities he used as part of his scheme to avoid plaintiffs' judgments and charging orders by having his personal expenses paid with BHG funds. *See infra* ¶¶ 28–29.

8. Birchwood Organizations, Inc. ("BOI") is a corporation organized under the laws of Virginia and has its principal place of business in Woodbridge, Virginia. Until its judicial sale in June 2000, BOI was wholly owned by Barrie Peterson. BOI, through Barrie Peterson—the company's president and sole employee—purported to provide technical support to manage and maintain the operating systems at Top Flight Airpark, and to supervise First Flight's employees in their day-to-day operations. BOI charged First Flight a fee based on four percent of its rental revenues at Top Flight. This fee totaled approximately $308,000 for 1996–1998.[5] BOI also paid Barrie Peterson's personal expenses directly and indirectly through payments to BHG, that were unsupported by any legitimate business purpose. *See infra* ¶¶ 27, 28 n. 16.

9. Defendant Maryland Air Industries, Inc. ("Maryland Air") is a Virginia corporation, wholly owned and controlled by Barrie Peterson. In *C.F. Trust v. Peterson*, Civil Action No. 97–2003–A (E.D.Va. Jan. 8, 1999), Maryland Air was determined to be the alter ego of Barrie Peterson.

10. PVD is a Virginia limited partnership. Barrie Peterson is PVD's sole general partner and its 93% limited partner. He is personally liable on PVD indebtedness secured by its real property. His wife, Nancy Peterson, is a 5% limited partner of PVD.

11. Occoquan is a Virginia limited partnership. Barrie Peterson, a 39% limited partner in Occoquan, owns an interest in Occoquan's sole general partner and is personally liable for Occoquan's indebtedness, which is secured by Occoquan's real property.

12. Carnett Commercial Investors, Inc., ("Carnett") is owned by Scott Peterson. Carnett holds a judgment against Barrie Peterson, individually and as Trustee, in the principal amount of $1,710,909.67. This judgment was entered by the Prince William County Circuit Court on July 30, 1993. On August 10, 1993, Carnett obtained a charging order on its judgment from the Prince William County Circuit Court against Barrie Peterson's partnership interest in First Flight. To the extent that the Carnett judgment against Barrie Peterson remains valid, it is in a priority position superior to the judgments held by C.F. Trust and Atlantic Funding.

## II. *Procedural History*

13. The parties in this action have engaged in extensive and protracted litigation regarding plaintiffs' effort to collect on

---

il Action No. 91–1084–A (E.D. Va. June 19, 2000).

**5.** Barrie Peterson chose to provide his management services to First Flight through BOI, rather than directly as a salary, in order to make use of net operating loss carry-forwards that BOI had accumulated. Barrie Peterson did not receive a salary from BOI.

their judgments. A listing of the principal cases follows:

(i) *C.F. Trust v. Peterson,* Civil Action No. 96–1128–A (E.D.Va. Dec. 9, 1996) (voiding as a fraudulent conveyance a deed of trust that Barrie and Nancy Peterson placed on their residence);

(ii) *C.F. Trust, Inc. v. DEP, Inc.,* Adversary Proceeding No. 97–1017 (Bankr.E.D.Va. Oct. 31, 1997) (finding J.P. Development, a corporation wholly owned and controlled by Scott Peterson, to be Barrie Peterson's alter ego), *aff'd sub nom. J.P. Development, Inc. v. C.F. Trust, Inc.,* C.A. No. 98–0079 (E.D.Va. Apr. 3, 1999), Case No. 98–1670 (4th Cir. Mar. 5, 1999);

(iii) *C.F. Trust, Inc. v. Peterson,* Civil Action No. 97–2003–A (E.D.Va. Jan. 8, 1999) (finding (a) that Maryland Air Industries and Maryland Air International were the alter egos of both Barrie and Scott Peterson, (b) that Scott Peterson used shell corporations to create appearance of encumbrances to frustrate legitimate creditors, and (c) that transfer of property to Scott Peterson was void as a fraudulent conveyance), *appeal pending sub nom. C.F. Trust, Inc. v. Jubal, Inc.,* 99–1197, 99–1198, 99–1199 (consolidated) (4th Cir.1999);

(iv) *Peterson v. Cooley,* 142 F.3d 181 (4th Cir.1998) (upholding the actions of CF Trust in acquiring notes and judgments against defendants);

(v) *DEP, Inc. v. Jacques,* Adversary Proceeding No. 97–1049 (Bankr. E.D.Va. Sept. 16, 1997) (declaring that CF Trust had a lawful first deed of trust encumbering two DEP properties);

(vi) *Peterson v. Atlantic Funding Corp.,* Civil Action No. 96–531–A (E.D.Va. 1996) (dismissing Barrie Peterson's claim that AFC judgment was not enforceable against him);

(vii) *DEP, Inc. v. Atlantic Funding Corp.,* Adversary Proceeding, No. 96–1167–SSM (Bankr.E.D.Va.1996);

(viii) *Peterson v. Atlantic Funding Corp.,* Civil Action No. 96–1476–A (E.D.Va.1996) (granting summary judgment in favor of Atlantic Funding);

(ix) *Peterson v. Cooley,* Chancery No. 41122 (Prince William County Circ. Ct.1997) (suit by Barrie Peterson against AFC and one of its officers alleging tortious interference and conspiracy in connection with acquisition of the Judgment);

(x) *Atlantic Funding Corp. v. Peterson,* Civil Action No. 91–1084 (E.D.Va. 1991) (finding of contempt against Barrie Peterson for failure to produce stock certificates).

This extensive and protracted litigation is strong evidence of Barrie Peterson's intent and efforts to evade payment of the outstanding amount due on plaintiffs' judgments.[6]

14. The instant suit, filed in November 1999, initially included claims for: (i) a declaratory judgment that First Flight, BHG, BOI, PVD, Maryland Air, Occoquan, Scott Peterson, Nancy Peterson, and other entities owned by Barrie or Scott Peterson are Barrie Peterson's alter egos; (ii) an injunction against asset transfers; (iii) an appointment of a receiver; (iv) violations of charging orders; (v) violation of a garnishment order; (vi) a declaratory judgment that the Carnett

---

**6.** The parties dispute the total amount of the judgments that is still outstanding. Defendants concede that approximately $3.5 million of the judgment is still owed to the plaintiffs.

charging order issued against Barrie Peterson is extinguished; (vii) conspiracy to injure plaintiffs in their trade or business in violation of Va.Code § 18.2–499 & 500; (viii) common law conspiracy; (ix) RICO violations; and (x) costs and attorneys' fees. Court rulings and voluntary dismissals left for trial only three counts against Barrie Peterson, First Flight, and Maryland Air: (i) declaratory judgment that entities are alter egos of Barrie Peterson; (ii) injunction against asset transfers; and (iii) appointment of a receiver.[7]

### III. *Abuse of the First Flight Partnership and its Partnership Distributions*

15. The record convincingly reflects that Barrie Peterson abused the First Flight Partnership by using it as a device to pay his personal expenses while insulating himself from payment of plaintiffs' outstanding judgments. An important initial step in this scheme was the transfer of Barrie Peterson's ownership interest in First Flight to his son and Upland, a corporation wholly owned by his son. As noted, both Barrie Peterson and Scott Peterson currently hold 49% limited partnership interests in First Flight. Until August 27, 1992, Barrie Peterson owned or controlled 100% of the partnership interest in First Flight, directly as 98% and sole limited partner and indirectly through his wholly owned Top Flight Airpark, Inc.

("Top Flight"), the sole general partner owning a 2% limited partnership interest. On August 27, 1992, Upland, a corporation wholly owned and controlled by Scott Peterson, became the sole general partner of First Flight. At this time, Upland also received a 2% partnership interest.

16. Upland paid only a nominal fee to become First Flight's General Partner. At the time Upland became First Flight's general partner, First Flight was in bankruptcy and had defaulted on a loan of approximately $12–13 million, secured by Barrie Peterson. In March 1996, First Flight received a loan of $6.5 million from Allied Capital Commercial Corporation ("Allied") from a refinancing of the Top Flight Airpark ("Allied Loan"). First Flight used the proceeds of this loan to settle the prior debt at a deep discount for First Flight and Barrie Peterson. The proceeds of the Allied Loan were also used to relieve Barrie Peterson of $3,275,536 of personal liability to UBS Securities. In 1997, First Flight obtained a $10 million loan, a portion of which was used to pay off the Allied Loan.

17. At about the same time that First Flight assumed the Allied Loan, Barrie Peterson transferred a 49% limited partnership interest in First Flight to Scott

**7.** By Order dated March 31, 2000, the Court dismissed the RICO count. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership*, Order, C.A. No. 99–1742–A (E.D.Va. Mar. 31, 2000). On June 23, 2000, plaintiffs' filed a motion to dismiss voluntarily Counts IV, VI, VII, VIII, and X, and defendants Occoquan and Carnett pursuant to Rule 41(a)(2), Fed.R.Civ.P. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership*, Order, C.A. No. 99–1742–A (E.D. Va. June 23, 2000). According to the parties' memoranda, plaintiffs accepted a $15,000 offer of judgment from BHG on Count V of the complaint (violation of a garnishment order). Furthermore, by Order dated March 31, 2000, this Court dismissed PVD Limited Partnership, a Florida corporation, in order to maintain diversity jurisdiction. *See C.F. Trust, Inc. v.*

*First Flight Ltd. Partnership*, Order, C.A. No. 99–1742–A (E.D.Va. Mar. 31, 2000). Furthermore, by Order dated August 25, 2000, this Court dismissed BHG and BOI for lack of controversy. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership*, Order, C.A. No. 99–1742–A (E.D.Va. Aug. 25, 2000); *Atlantic Funding Corp. v. Peterson*, Order, C.A. No. 91–1084–A (E.D. Va. June 19, 2000) (order allowing Atlantic Funding to become the sole owner of BHG and BOI). Finally, by Order dated August 25, 2000, defendants' partial summary judgment was granted in favor of Nancy Peterson and Scott Peterson, resulting in their dismissal from the action. *See C.F. Trust, Inc. v. First Flight Ltd. Partnership*, Order, C.A. No. 99–1742–A (E.D.Va. Aug. 25, 2000).

Peterson. Scott Peterson testified that it was his financial ability that made the Allied Loan refinancing possible, and that as a result, the Loan Agreement between First Flight and Allied provided that Scott Peterson would personally guarantee the loan and, as President of Upland, would have "exclusive responsibility for the day-to-day management" of First Flight's business operations. Accordingly, he testified that in consideration of his guarantee of the Allied Loan, he became a 49% limited partner in First Flight and was entitled to receive all distributions made by the partnership. This testimony, however, is not credible. Instead of serving the interests of Allied Capital, the transfer of ownership from Barrie Peterson to Scott Peterson was the next critical step in Barrie Peterson's scheme to avoid payment of his debts to the plaintiffs in this case. This is so because, despite the official transfer of ownership, (i) Barrie Peterson maintained control over First Flight's operations, contrary to the terms of the Loan Agreement, and (ii) First Flight's Partnership Agreement did not permit Scott Peterson to have unilateral control over the distributions to First Flight's limited partners.

18. Moreover, the record as a whole contradicts Scott Peterson's testimony that he had complete control over First Flight. Barrie Peterson performed financial, administrative, management, technical, and other services for First Flight. And, BOI, through Barrie Peterson—that company's president and sole employee—provided technical support to manage and maintain the operating systems at Top Flight Airpark and to supervise First Flight's employees in their day-to-day operations. In this position, Barrie Peterson had the sole authority to direct First Flight expenditures on routine maintenance or operational expenses. Non-routine expenses required approval, at least nominally, from Scott Peterson in his capacity as President of the Upland Group, First Flight's general partner. Accordingly, Barrie Peterson accounted for approximately 90% of First Flight's work and spent more time at First Flight than anyone else. Furthermore, Scott Peterson testified that he visited First Flight at most, once a week and that all decisions regarding First Flight were made only after obtaining his father's approval. In sum, the record reflects that Barrie Peterson retained decisionmaking control over First Flight contrary to the terms of the Allied Loan and the First Flight partnership agreement. This control manifested itself, as will be seen, in transfers of substantial funds from First Flight to Scott Peterson and to other Barrie Peterson-controlled entities as part of the scheme to have Barrie Peterson's personal expenses paid with funds that were beyond the reach of plaintiffs' charging orders.

19. Barrie Peterson utilized his *de facto* control over First Flight to direct that it make distributions of substantial funds to Scott Peterson and to BHG for the payment of Barrie Peterson's personal expenses. Contrary to the testimony of Barrie Peterson and Scott Peterson, neither the loan documentation, nor First Flight's partnership agreement, enabled Scott Peterson or Upland to make unilateral decisions regarding First Flight's partnership distributions. Despite this, from March 15, 1996 to December 31, 1999, Scott Peterson received over $4.3 million in distributions from First Flight while making, at most, $800,000 in capital contributions. Had these funds been properly distributed, Barrie Peterson would have been entitled

to a distribution of approximately $2.15 million, an amount which would then have been subject to plaintiffs' charging orders and thus used to satisfy plaintiffs' judgments.

20. The more than $4 million in distributions to Scott Peterson, made chiefly from the proceeds of the 1997 $10 million loan, contravened the requirements of the First Flight partnership agreement and therefore conclusively establish that First Flight and Upland failed to follow the requisite business and corporate formalities. Defendants mistakenly contend that Sections 12.5 and 12.6 of First Flight's partnership agreement permitted the distribution of over $4 million to Scott Peterson while distributing nothing to Barrie Peterson.[8] This argument fails because even assuming funds were available for distribution after repayment of the Allied Loan from the proceeds of the 1997 refinancing of the Top Flight Airpack, Scott Peterson was still not entitled to distributions under Section 7.22 of the Partnership Agreement because his capital account never showed a positive balance.

21. Scott Peterson made capital contributions to First Flight in small amounts only *after* he distributed to himself the

$4.3 million. Taking into account the result of the contributions he made to First Flight and the distributions that were made to him, Scott Peterson's capital account with First Flight showed a negative balance of $3.17 million by the end of 1999. Moreover, to the extent that Scott Peterson's capital account was greater than Barrie Peterson's, this was only a result of the fact that when Barrie Peterson transferred 49% of the limited partnership to Scott Peterson for little or no consideration, he did not also transfer a corresponding share of his existing negative capital balance. Had he done so, Scott Peterson's capital account would have been less than Barrie Peterson's. Accordingly, distributions should have been made in proportion to each limited partner's respective ownership interests.

22. Defendants also argue that even if sections 12.5 and 12.6 do not provide sufficient authority, the Amendment of the partnership agreement shortly after the admission of Scott Peterson to the First Flight Partnership enabled him, as the General Partner, to distribute all of First Flight's limited partnership distributions only to himself.[9] This argument fails because the partnership agreement does not confer this authority. The Amendment

---

8. First Flight's partnership agreement provided that "Cash from Operations ... shall be distributed 98% to the Limited Partners on a Pro Rata Basis" and that "Cash from Financings [after repayments of the refinanced debt, establishment of reserves and repayment of capital contributions] will be distributed ... first, to the Limited Partners on a Pro Rata Basis." First Flight Partnership Agreement §§ 12.5, 12.6. Furthermore, the agreement defines "Pro Rata Basis" as "an allocation or distribution to the Limited Partners in proportion to their respective Capital Contributions." *Id.* § 7.22.

9. The Amendment provides:

Notwithstanding anything contained in the agreement to the contrary the General Partner shall have the sole right and authority to determine whether the profits of the Partnership should be distributed to the limited partners and that its decision shall be binding on the Partnership. No profits, distributions, allocations, proceeds or any other payments of any kind shall be paid by the Partnership to any limited partner unless such payment is approved in writing by the General Partner, in his sole discretion.

does not specify that the General Partner can determine *to whom* the distributions will be made; rather, the General Partner can only determine *whether* distributions shall be made. Accordingly, distributions made pursuant to the Amendment must be made to each limited partner based on his respective partnership interest. Finally, assuming *arguendo* that the Amendment permitted Scott Peterson to make all the distributions to himself, his actions were still in violation of the First Flight partnership agreement because the Amendment requires that any payment or distribution must be approved in writing. No written documentation exists to support this distribution.

23. The record as a whole reflects that Barrie Peterson structured and controlled his various entities to achieve the payment of his personal expenses with funds that were beyond the reach of plaintiffs' charging orders. The transfer in ownership was not a result of Scott Peterson's loan guarantee, but rather a gift to enable Barrie Peterson to develop and further his scheme to evade payment of the plaintiffs' judgments.

24. The improper $4.3 million distribution to Scott Peterson had two primary effects. First, had the distribution been properly paid to the limited partners *pro rata*, as required, approximately $2 million would have been distributed to Barrie Pe-

terson, and this amount would then have been subject to collection by plaintiffs through the operation of their valid charging orders. Second, the improper distribution provided Scott Peterson with funds he could transfer to BHG, which could then pay Barrie Peterson's personal expenses with funds beyond the reach of plaintiffs' charging orders. Scott Peterson did precisely this, transferring approximately $687,000 to BHG, ultimately to be used to pay Barrie Peterson's personal expenses.[10] Also, Scott Peterson used a portion of the $4.3 million distribution to funnel funds back to First Flight to ensure its solvency after First Flight had made substantial overpayments to BHG to pay Barrie Peterson's personal expenses. *See infra* Part IV.

## IV. Abuse of BHG and Other Controlled Entities to Pay Barrie Peterson's Personal Expenses

25. The record also convincingly reflects that Barrie Peterson accomplished his scheme to evade plaintiffs' judgments and charging orders by impermissibly using BHG to pay his personal expenses. This scheme enabled BHG to collect approximately $1.9 million in overpayments for the administrative services it provided to Barrie Peterson-controlled entities. BHG then used these funds to pay over $2 million in Barrie Peterson's personal expenses.[11]

---

**10.** Scott Peterson and Barrie Peterson's testimony was contradictory as to the purpose and nature of the $687,000 payments to BHG. Scott Peterson testified that he was repaying loans that were made directly from his father; while Barrie Peterson testified that Scott Peterson was repaying loans made from Barrie Peterson-controlled entities. More significantly, though, there is no proof, other than the Petersons' testimony, that these loans

were ever made. Because the testimony of both Barrie and Scott Peterson, in this case, was not credible, there is no basis to conclude that these distributions and overpayments to BHG and BOI were anything other than an attempt to evade Barrie Peterson's personal obligations to the judgment creditors.

**11.** For a description of the personal expenses paid by BHG, see *infra* ¶¶ 28–29.

26. BHG provided management and administrative services to many of the companies Barrie Peterson and Scott Peterson owned, controlled, and operated. These services included financial record-keeping and assistance in tax return preparation, administration of payroll and accounts payable functions, client billing, lease administration, and similar support services. BHG charged fees to Peterson entities in accordance with an operating cost allocation formula that had been in effect since 1992, based in part on the recommendation of BHG's accountant. This formula allocated BHG's costs plus a 10% profit among the various entities, using BHG's services.

27. During the course of the year, the entities receiving management support from BHG would often pay funds to BHG, purportedly as an advance of the fee to be owed through the cost allocation formula. When the cost allocation was determined during the following year, the amount would be listed either as a liability or as an asset on the company's books, depending on whether the entity had overpaid or underpaid under the allocation formula during the previous year. These pre-payments, however, were not based on any estimate of that entity's share of the cost allocation, but instead were simply a means by which Barrie Peterson could pay his personal expenses with funds beyond the reach of plaintiffs' charging orders. As a result of these pre-payments, Barrie Peterson and Scott Peterson con-

trolled entities transferred to BHG $1.9 million in excess of the cost allocation assessed by BHG. No legitimate business purpose was served by these excess payments, and except for the return of a small amount of funds to First Flight, BHG has never refunded these excess payments. Significantly, at the same time these excess payments were being made, BHG paid approximately $2 million of Barrie Peterson's personal expenses. The transfer of excess funds to BHG was accomplished in the following manner:

A. BOI transferred $267,000 to BHG. The record does not reflect that any legitimate business purpose was served by this transfer of funds. BOI was not assessed a portion of the cost allocation, and no supporting documentation or evidence of adherence to corporate formalities exists for this transfer.

B. Maryland Air transferred approximately $619,000 to BHG. This amount exceeded the cost allocation by more than $565,000. Maryland Air's cost allocation was $13,682,61 in 1996, $14,970.36 in 1997, and $24,542.94 in 1998.

C. During the years 1996, 1997, 1998, and 1999, BHG charged First Flight a total of at least $972,338 for management and administrative services rendered to First Flight. In the period beginning February 1, 1996, the date on which C.F. Trust obtained the CF Judgments, through December 30, 1999, First Flight transferred to BHG approximately $1,350,000.[12] In essence, First

12. In 1996, First Flight paid BHG $172,019 more than the cost allocation for management and administrative services. No supporting documentation for the overpayment, such as loan documents providing for interest or repayments terms, was provided. In 1997, First Flight paid BHG $67,286 more than the cost allocation for management and administrative services. This amount represented more than 91% of BHG's actual costs. In 1998, First Flight paid BHG $243,000 more than the cost allocation for management and administrative services. This amount represented more than 96% of BHG's actual costs. No supporting documentation for these overpayments was provided. Further support that this excess payment lacked a justifiable business purpose is the fact that during this same period, First Flight also paid a management fee to BOI for Barrie Peterson's day-to-day management and to Upland.

Flight was BHG's primary source of money, in other words, its cash cow. Between 1992 and 1998, it was commonplace for many of Barrie and Scott Peterson's entities not to pay their share of the cost allocation to BHG. The failure to pay would result in an entry in BHG's books that the owner had paid the allocation, and the owner then became liable to BHG for that amount. Despite the failure to pay the cost allocation by many Peterson-controlled entities, however, BHG received sufficient funds to continue providing services because of the money it received from First Flight. Scott Peterson testified that he, as First Flight's General Partner, would allow payments to be made to BHG without questioning whether the request was for a legitimate business purpose. Instead, he testified that when Barrie Peterson claimed that BHG needed money, he would disburse First Flight funds to BHG to cover its cash shortfall, owing to its payment of Barrie Peterson's personal expenses.[13]

D. Finally, Scott Peterson transferred $687,000 to BHG. *See supra* ¶ 24 & n. 12

28. As a result of these overpayments, the funds of BHG, First Flight, Maryland Air, and Scott Peterson were commingled with the funds of Barrie Peterson. Accordingly, Barrie Peterson was able to siphon money from these entities to pay approximately $2 million for his personal benefit with funds not subject to plaintiffs' charging orders. These personal expenses were listed in BHG's ledger under Barrie Peterson's shareholder account and included: (i) personal credit card expenses, (ii) his and his wife's legal bills, (iii) Nancy Peterson's Mercedes–Benz automobile, (iv) mortgage payments on the Petersons' homes in Fairfax, Virginia and Nantucket Island, Massachusetts, (v) college tuition for Peterson's son, Christopher, (vi) Barrie Peterson's personal country club membership, and (vii) additional payments directly to Nancy Peterson. No minutes, resolutions, memoranda, or other corporate documents authorize or support these payments.[14]

29. In addition to these personal expenses, BHG made a number of payments

13. The arrangement between First Flight and BHG for the provision of management services was also in violation of First Flight's partnership agreement, which prohibited First Flight from entering into any transaction with any affiliate or related person "except on fair and reasonable terms which are at least as favorable to [First Flight] as would be the case in a comparable arm's-length transaction with an unaffiliated and unrelated entity or person." First Flight did not engage in an arm's length transaction with BHG. In the course of his testimony, Scott Peterson admitted that he never determined whether the fee charged by BHG was reasonable or questioned the legitimacy of Barrie Peterson's request for payments from First Flight. To the extent that First Flight made overpayments to BHG, no money would be available for distribution to Barrie Peterson, as a First Flight limited partner, and hence, no money would be available for collection by plaintiffs.

14. Notwithstanding the undisputed nature of these payments by BHG, Barrie Peterson testified under oath, in a judgment-enforcement deposition in February 1998, that he did not have any documents in his possession regarding (i) sources of income, funds, or money from June 1996 to February 1998, (ii) sources of income expected or anticipated after February 1998, (iii) sources of income to make mortgage payments on his Fairfax and Nantucket residences, and (iv) funds or other property of any kind or nature that Peterson had or anticipated having. *See C.F. Trust, Inc. v. Peterson*, Deposition, Civ. A. Nos. 96–264–A, 96–265–A, at 4–5, 12–13 (E.D.Va. Feb. 27, 1998).

to satisfy Barrie Peterson's personal debt obligations. Specifically, BHG made payments to PVD totaling approximately $325,000. No documentation exists to support any justification for this payment. PVD used a portion of these funds to make payments on a PVD debt on which Barrie Peterson was personally liable. BHG also satisfied a personal obligation of Barrie Peterson to James McClure in the original principal amount of $100,000 plus interest, and a personal obligation that Scott Peterson had made as security for Barrie Peterson's obligation to McClure. BHG also made payments to Occoquan in excess of $125,000. Again, no documentation provides any justification for this payment. Occoquan used these funds to make payments on a PVD debt for which Barrie Peterson was personally liable.[15] These are further examples of payments of Barrie Peterson's personal expenses or obligations by Barrie Peterson's controlled entities with funds beyond the reach of plaintiffs' charging orders.

30. The testimony during the trial was clear that the payment of over $2 million of Barrie Peterson's personal expenses and obligations was not ordinary and customary in the industry. Barrie Peterson testified that the payment of his personal expenses was repayment of loans. When owners of businesses loan money to their affiliated entities, however, it is ordinary and customary for there to be checks directly from the owner to the entity for the loan and checks directly from the entity to the owner for the repayment. Furthermore, it would be ordinary and customary for there to be loan documents evidencing the indebtedness between the entities. None of these formalities is present.

31. Barrie Peterson had no bank account in his name and, thus, had no means to pay his personal expenses directly. According to Barrie Peterson, whenever "money was available" from BHG, he would use the funds to pay for his personal expenses.

32. In 1999, Barrie Peterson formed Birchwood Management, LLC ("BMLLC"). This company (i) performs the same functions and uses the same people, offices, and equipment as BHG, (ii) has no revenue source other than its charges to Peterson-related entities for administrative and management services, and (iii) continues to pay Barrie Peterson's personal expenses.

33. In sum, Barrie Peterson evaded his obligation to plaintiffs by directing that the entities he owned and controlled overpay the fee for BHG's administrative services, thereby commingling the money of First Flight and Maryland Air with BHG. Barrie Peterson then directed that BHG pay his personal expenses with funds not subject to plaintiffs' charging orders.

## V. *Violation of Garnishment Orders and Intent to Avoid Payment of Judgments*

34. On or about March 18, 1999, C.F. Trust served garnishment summonses with respect to the CF Judgments on BHG, BOI, Maryland Air, and Maryland Air International, Inc. ("International"). All four companies responded that "said garnishee (Barrie Peterson) does not owe the

---

**15.** In addition to payments by BHG for Barrie Peterson's personal expenses, BOI, Maryland Air, and First Flight also paid Barrie Peterson's personal expenses directly. For example, BOI transferred at least $25,000 to Nancy Peterson at the direction of Barrie Peterson. BOI had no financial obligation to Nancy Peterson. Maryland Air also made payments, at the direction of Barrie Peterson, on Barrie Peterson's home mortgage and transferred approximately $36,000 to Nancy Peterson. Finally, First Flight made three direct payments of Barrie Peterson's personal expenses, which included, a payment of $1,500 to Nancy Peterson in March 1996, and two mortgage payments totaling $8,500 made in May 1996.

Defendants any sums of money, nor are the Defendants entitled to receive any sums of money for the period covering said garnishment from this garnishee." *See, e.g., C.F. Trust, Inc. v. Peterson,* Answer, Civ. A. No. 96–264–A, 96–265–A (E.D. Va. June 14, 1999) (answer of Garnishee BOI). Nevertheless, BHG transferred $15,000 directly to Barrie Peterson on May 17, 1999.

35. In Count V of the complaint in this matter, plaintiffs sought recovery of the $15,000 transferred in violation of the garnishment order. The parties reached agreement that BHG would return this money, and accordingly, plaintiffs moved to dismiss Count V. While Count V has been dismissed, Barrie Peterson has neither returned the money to BHG nor paid it to C.F. Trust. ·

36. After these garnishments were served, Barrie Peterson told his accountant that in the future, Scott Peterson was going to be advancing funds, particularly to Nancy Peterson, for payment of Barrie Peterson's personal expenses.[16]

37. These facts, along with the extensive and protracted history of litigation between these parties, convincingly demonstrate that Barrie Peterson orchestrated a scheme to evade payment of his outstanding obligations to plaintiffs, his judgment creditors. While Barrie Peterson testified that he has never had any conversations about devising mechanisms to avoid payment to his creditors, this testimony is not credible. For example, Gayle Whitlock, Barrie Peterson's accountant, testified that Barrie Peterson stated, "I want to ... make sure I don't pay Mr. Cooley (the owner of Atlantic Funding) any money." Furthermore, Scott Peterson testified that "[m]y father and I often talked about the fact that my dad does not

want to pay them the judgments." Accordingly, despite Barrie Peterson's claim that he has not engaged in a scheme to evade payment to his creditors, the record, as a whole, clearly indicates that he intended to accomplish that precise end. He has not made any voluntary payments to his judgment creditors, and he has thus far largely succeeded in his scheme to frustrate plaintiffs' efforts to collect on their valid judgments.

38. A review of the history of litigation between the parties sheds further light on the credibility of Barrie Peterson's testimony in the instant case. These past cases resulted in two findings of fraudulent conveyances and three direct findings that Barrie Peterson had testified falsely. A particularly appropriate finding is in *C.F. Trust, Inc. v. Peterson,* Civil Action No. 97–2003–A (E.D.Va. Jan. 8, 1999), where the district court found that

> Barrie Peterson, an acknowledged professional litigant, has engaged in a pattern of misstating the existence, value, number, and nature of his properties, other assets, and liabilities in various financial documents, legal filings, depositions, and conversations, many of these under oath ... [and that his defense at trial] was fabricated for this litigation.

Furthermore, in another case, a Bankruptcy court stated that

> To put the matter charitably, truth is not the brightest star in Mr. Peterson's constellation.

*C.F. Trust, Inc. v. DEP, Inc.,* Adversary Proceeding No. 97–1017 (Bankr.E.D.Va. Oct. 31, 1997). These cases provide further support for the Court's finding that Barrie Peterson's testimony in this case was not credible, and therefore, that Bar-

---

**16.** Nancy Peterson was responsible for paying the Petersons' household expenses every month with sums transferred by one or more of Barrie Peterson's entities. Until the gar- nishment violations occurred, Barrie Peterson directed his accountant to deposit the needed funds from BHG, BOI, First Flight, or Maryland Air into Nancy Peterson's account.

rie Peterson took all available steps to evade payment of his obligations to plaintiffs.

## CONCLUSIONS OF LAW

### I. *Jurisdiction and Venue*

39. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, which confers original jurisdiction for civil actions between citizens of different states and involving an amount in controversy exceeding $75,000.

40. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391 as all defendants reside within the State of Virginia.

### II. *Res Judicata Effect on Maryland Air Industries*

■ 41. In *C.F. Trust, Inc. v. Peterson*, Civil Action No. 97–2003–A (E.D. Va. Jan 8, 1999), *appeal pending, sub nom., C.F. Trust, Inc. v. Jubal, Inc.*, Case Nos. 99–1197, 99–1198, 99–1199 (consolidated) (4th Cir.1999), a district court found that Maryland Air is the alter ego of Barrie Peterson. Principles of res judicata mandate that this ruling be applied in the instant matter. *See infra* ¶ 42.

■ 42. As a threshold matter, federal, rather than state, law regarding res judicata governs the outcome of this case. This question is significant because federal and state law treat differently the preclusive effect of a judgment pending appeal. While state law certainly controls the rights and duties of the parties in a federal action founded upon diversity of citizenship, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "[f]ederal law determines the effects under the rules of res judicata of a judgment of a federal court." Restatement (Second) of Judgments § 87 (1982). The Fourth Circuit has recognized that "whether a federal court sits in diversity or has some other basis of jurisdiction, questions of the effect and scope of its judgment involve the pow-

er of the federal tribunal itself, and are not varied merely because state rules of decision underlie the judgment." *Harnett v. Billman*, 800 F.2d 1308, 1312 (4th Cir. 1986); *see also Fireman's Fund Insurance Co. v. International Market Place*, 773 F.2d 1068, 1069 (9th Cir.1985); *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1503 (11th Cir.1984); *Hunt v. Liberty Lobby, Inc.*, 707 F.2d 1493, 1497 (D.C.Cir.1983). Any other result would "consign the effect of federal judgments to the uncertainties of state law in whatever jurisdiction a subsequent suit happened to be brought." *Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1179–80 (4th Cir.1989). Accordingly, federal principles of res judicata must control. Under these rules, three factors must be established to give a prior ruling preclusive effect: (i) an identity of cause of action between both suits; (ii) final judgment on the merits in the prior suit; and (iii) an identity of parties or their privies in the two suits. *See Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir.1991). There is no dispute as to the first prong. Second, given the application of federal law, it is also settled that the judgment in the previous action is final. The established rule in the federal courts is that a final judgment retains all of its preclusive effect pending appeal. *See Guinness PLC v. Ward*, 955 F.2d 875, 898 (4th Cir.1992); *SSIH Equipment S .A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 370 (Fed.Cir.1983) (noting that final judgment retains all of its res judicata consequences pending decision of the appeal); 18 Wright, Miller & Cooper, Federal Practice and Procedure, § 4433, at 308 (1981). Finally, the third prong of the res judicata analysis is satisfied because there exists an identity of parties or their privies in the two suits. While Maryland Air was not a party to the previous action, Barrie Peterson, Maryland Air's president and sole shareholder, was. It is settled

that a president of a corporation satisfies the privity requirement. *See Levine v. McLeskey,* 881 F.Supp. 1030, 1055 (E.D.Va.1995) (noting the privies include the president, chief executive officer, and a 50% shareholder of a corporation). Accordingly, the decision in *C.F. Trust v. Peterson,* Civil Action No. 97–2003–A, that Maryland Air is the alter ego of Barrie Peterson is binding in this matter.

### III. *Reverse Piercing Against First Flight*

■ 43. In *C.F. Trust v. First Flight Limited Partnership,* 111 F.Supp.2d 734 (E.D.Va.2000), the "reverse piercing of the corporate veil" doctrine was recognized under the law of the state of Virginia. This doctrine was also found to be applicable to limited partnerships as well as corporations.[17]

■ 44. The reverse piercing of the corporate veil doctrine is not itself an independent cause of action; rather it establishes a means of imposing liability on an underlying cause of action. *See Peacock v. Thomas,* 516 U.S. 349, 353–54, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996); *Shearson Lehman Hutton, Inc. v. Venners,* 165 F.3d 912, 1998 WL 761505 at *1–2 (4th Cir. 1998); *Fidelity Nat. Title Ins. Co. v. Bozzuto,* 227 B.R. 466, 471 n. 8 (E.D.Va.1998). Defendants contend that the sole remaining cause of action in this case—the one seeking to pierce the veil in reverse—is insufficient to support jurisdiction over this proceeding. This argument fails, however, because plaintiffs' complaint does contain an underlying cause of action, that is, a cause of action to collect on the unpaid judgments owed by Barrie Peterson to C.F. Trust and Atlantic Funding.

■ 45. The Supreme Court of Virginia has not squarely addressed the issue of whether a judgment creditor can pierce the corporate veil based on a cause of action to collect on an unpaid debt. *Greenberg v. Commonwealth,* 255 Va. 594, 499 S.E.2d 266 (1998), however, indicates that if presented with these facts, the Supreme Court of Virginia would permit the action to proceed. In *Greenberg,* the Commonwealth filed a separate action against Greenberg after the Commonwealth had obtained a judgment against him. The Supreme Court of Virginia dismissed the action, not because Virginia law did not permit piercing of the veil based on a collection action, but rather because the facts did not show that defendant had a sufficient unity of interest and control with the corporation. *See id.* at 603–05, 499 S.E.2d 266; *see also Steyr–Daimler–Puch of America Corp. v. Pappas,* 852 F.2d 132 (4th Cir.1998) (permitting piercing of the corporate veil claim to collect on outstanding judgment). Moreover, permitting this action to proceed is justified by principles of fairness and equity. This is so because if the law did not permit plaintiffs to sue to collect on their underlying judgments in these circumstances, judgment debtors would be provided a roadmap on how to avoid payment of their outstanding obligations. Put differently, judgment debtors, like Barrie Peterson, could use their corporations and partnerships to pay their personal expenses with funds beyond the reach of charging orders, thereby forever avoiding their obligations to judgment creditors. This is an untenable result the law should not allow. Accordingly, plaintiffs can maintain their action to pierce the veil of First Flight in reverse based on the underlying cause of action to collect on the judgments held by C.F. Trust and Atlantic Funding.

---

17. *See First Flight,* 111 F.Supp.2d at 740 & n. 11 ("In a reverse piercing action ..., the plaintiff seeks to reach the assets of a corporation to satisfy claims against a corporate insider.").

46. "[T]he standard for piercing the corporate veil ... has occasioned much litigation, perhaps because, as the Supreme Court of Virginia has stated 'no single rule or criterion ... can be applied to determine whether piercing the corporate veil is justified.'" *First Flight,* 111 F.Supp.2d at 741 (quoting *O'Hazza v. Exec. Credit Corp.,* 246 Va. 111, 115, 431 S.E.2d 318 (1993)). Rather than a precise formula, the veil piercing determination requires a "fact-specific inquiry into the circumstances surrounding the corporation, the related parties, and the acts in question." *First Flight,* 111 F.Supp.2d at 741. Nevertheless, the Supreme Court of Virginia has cautioned that piercing the corporate veil is justified only under exceptional circumstances, which occur (i) when the "unity of interest and ownership is such that the separate personalities of the corporation and the individual no longer exist and to adhere to that separateness would work an injustice," and (ii) when the shareholder has "used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage ...." *O'Hazza,* 246 Va. at 115, 431 S.E.2d 318; *see also Cheatle v. Rudd's Swimming Pool Supply Co., Inc.,* 234 Va. 207, 212, 360 S.E.2d 828 (1987). Because Barrie Peterson used the entities he owns and controls as part of his scheme to evade payment of plaintiffs' judgments, an action to pierce the veil in reverse is justified by the facts of the case at bar.

47. As noted, the veil-piercing analysis properly begins with a showing of a unity of interest and control between an individual owner or shareholder and the corporation or partnership. While no single factor is determinative, the Supreme Court of Virginia has identified a number of factors that when viewed in the totality of the circumstances may suggest a unity of interest and control. Specifically, the Supreme Court of Virginia has focused on (i) whether personal and business assets were commingled, (ii) whether the individual "siphoned [business] assets into their own pockets," (iii) whether the business entity was undercapitalized, or (iv) whether business formalities were observed. *Cheatle,* 234 Va. at 212, 360 S.E.2d 828; *see also Greenberg,* 255 Va. at 604–05, 499 S.E.2d 266; *O'Hazza,* 246 Va. at 115, 431 S.E.2d 318; *Lewis,* 207 Va. at 31, 147 S.E.2d 747. The record facts of this case confirm that factors (i), (ii), and (iv) are present here.

48. It is not enough, though, that these factors are present. Piercing of the corporate veil in reverse is appropriate only if Barrie Peterson used his control over First Flight to evade a personal obligation. Specifically, piercing will be denied if a valid business purpose is served by the conduct at issue. For example, in *O'Hazza,* the Supreme Court of Virginia refused to pierce the corporate veil because the financial support that defendants provided to their son through a monthly loan from the corporation and the tax consequences from a subchapter S election did not suggest any impropriety. *See O'Hazza,* 246 Va. at 118, 431 S.E.2d 318. The Supreme Court of Virginia found that these actions were "common and legitimate." *Id.* Likewise, in *Cheatle,* the Supreme Court of Virginia refused to pierce the corporate veil because there was no evidence (i) that there was commingling of personal and business assets, (ii) that business assets were siphoned away for personal use, (iii) that corporate formalities were ignored, or (iv) that a valid business purpose for the transactions was lacking. *See Cheatle,* 234 Va. at 213, 360 S.E.2d 828. Similarly, in *Greenberg,* the Supreme Court of Virginia upheld a lower court's decision not to pierce the corporate veil because the shareholder had not used the corporate structure to evade obligations or to perpetrate a fraud; instead, the Supreme Court found that his actions were justified by valid business reasons. *See Greenberg,*

255 Va. at 604–05, 499 S.E.2d 266 (finding that the manner in which defendant recouped his loan to corporation was justified by corporation's inability to abide by its agreement to repay the loan within the period specified in the loan agreement).

49. These principles applied here compel the conclusion that First Flight is the alter ego of Barrie Peterson and that, accordingly, an action to pierce the veil in reverse is appropriate. The facts of the case at bar reflect both that the unity of interest is such that the "separate personalities of [First Flight and Barrie Peterson] no longer exist," *O'Hazza,* 246 Va. at 115, 431 S.E.2d 318, and that Barrie Peterson used this control to evade his obligations to his creditors. In this regard, Barrie Peterson maintained control over First Flight and its distributions—despite the official transfer of control and ownership of First Flight to Scott Peterson,[18] commingled his personal funds with the funds of the entities that he controlled and owned,[19] siphoned business assets for his personal use,[20] and caused First Flight to ignore the requirements of its partnership agreement.[21] Given this control and unity of interest with First Flight, Barrie Peterson was able to evade his obligation to his creditors by directing the transfer of millions of dollars out of First Flight to Scott Peterson and to BHG for the payment of his personal expenses.

50. Defendants argue that these facts are insufficient to justify an action to pierce the corporate veil in reverse because First Flight is not a sham or paper entity.[22] This argument fails, because while operating as a sham entity might *ipso facto* establish the grounds for piercing the corporate veil, it is not the sole means.[23] Instead, as noted, the appropriate inquiry is whether the conduct in question was supported by a legitimate business purpose.

51. In the case at bar, no legitimate business purpose supports the $4.3 million distribution to Scott Peterson and the transfer of funds above the cost allocation to BHG. Indeed, the record reflects that these transfers were part of Barrie Peterson's scheme to avoid plaintiffs' judgments and charging orders by having his personal expenses paid with funds from entities he owns and controls.[24] None of the defense witnesses could provide a legitimate justification for the overpayment of the cost allocation formula. Instead, the record convincingly reflects that Barrie Peterson directed payments from First Flight and Maryland Air to BHG whenever funds were needed to pay his personal expenses.[25]

18. *See supra* ¶¶ 15–19.

19. *See supra* ¶¶ 25–30.

20. *See id.*

21. *See supra* ¶¶ 20–24, 27(C) n. 14

22. *See supra* ¶ 6 for a discussion of First Flight's operation of Top Flight Airpark. In addition, First Flight had gross rental revenues of approximately $2.8 million annually. It reported net income of $270,789 in 1996, a loss of $246,624 in 1997, and net income of $646,947 in 1998.

23. In *Lewis Trucking Corp. v. Commonwealth,* 207 Va. 23, 147 S.E.2d 747 (1966), the Supreme Court of Virginia held that a transfer of assets to a paper corporation was "merely a device or sham to hide his ownership." *Id.* at 31, 147 S.E.2d 747. In no case following *Lewis Trucking* has the Supreme Court of Virginia required that an entity have no value—that is, a paper corporation—as a prerequisite for an action to pierce the corporate veil.

24. *See supra* ¶¶ 25–30.

25. *See supra* ¶ 24. Significantly, the largest personal expense paid on Barrie Peterson's behalf by BHG and BOI was his legal expenses to fight C.F. Trust and AFC from collecting on their judgments.

52. In sum, plaintiffs have conclusively established the grounds necessary to support piercing the corporate veil in reverse. Barrie Peterson "treated his corporate and personal affairs as if they were indistinguishable," *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1048 (4th Cir.1988), by directing the affairs of First Flight, Maryland Air, BHG, and BOI to ensure that he received the funds he needed to pay for his personal expenses and that the remainder was passed on to his son through distributions from First Flight. This scheme enabled Barrie Peterson to accomplish his expressed desire to avoid payment to plaintiffs, his legitimate judgment creditors.

### IV. *Remedies*

53. Plaintiffs seek three forms of relief in this matter: (i) an order declaring First Flight and Maryland Air to be the alter egos of Barrie Peterson and thus that the assets of these entities are subject to the CF Judgment and the AFC Judgment; (ii) a permanent injunction prohibiting the transfer or disposition of any assets of Barrie Peterson, or the transfer or disposition of any assets or ownership interests in First Flight and Maryland Air, except as may be necessary in the ordinary course of business. Plaintiffs further request that any transfers permitted under this injunction cannot be made to or for the benefit of Barrie or Nancy Peterson, except payments to C.F. Trust or Atlantic Funding to satisfy the outstanding judgments; and (iii) appointment of a receiver(s) to administer the business and affairs of Barrie Peterson, First Flight, and Maryland Air.

54. Because plaintiffs have proven the grounds necessary to pierce the veil in reverse of First Flight and Maryland Air, plaintiffs are entitled to an order declaring that First Flight and Maryland Air are the alter egos of Barrie Peterson and that their assets are subject to the CF Judgment and the AFC Judgment.

55. Plaintiffs' request for a restitutionary award from First Flight must be denied. Even assuming the power to order such a remedy, *see SSDS, Inc. v. Mayor*, 215 F.3d 1321 (4th Cir. June 5, 2000); 66 Am.Jur.2d Restitution and Implied Contracts §§ 3,4, First Flight is not a suitable candidate; it has not been unjustly enriched and therefore is not itself profiting from the improper distributions to Scott Peterson and indirectly to Barrie Peterson. Moreover, the effect of the declaration that First Flight and Maryland Air are the alter egos of Barrie Peterson is that plaintiffs, as judgment creditors, can now seek satisfaction of their judgments from the assets of First Flight and Maryland Air as well as from those of Barrie Peterson. Accordingly, an award of restitution would be redundant and of little utility to plaintiffs.

56. If Barrie Peterson continues to abuse First Flight and Maryland Air to evade his obligation to his judgment creditors, plaintiffs can return to Court to seek further injunctive relief.

57. Plaintiffs request for the appointment of a receiver must be denied. A court's power to appoint a receiver should "be exercised with caution and only in a strong case." *Bethlehem Steel Corp. v. Williams Indus., Inc.*, 245 Va. 38, 425 S.E.2d 484 (1993). Therefore, a court of equity is not empowered to appoint a receiver for a corporation, "absent proof of insolvency, fraud, waste, or improper conduct." *Adelman Assoc. v. Goldsten*, 209 Va. 731, 738, 167 S.E.2d 104 (1969). Here, the record does not reflect that First Flight or Maryland Air is insolvent. Moreover, while plaintiffs have successfully proven that these entities are the alter egos of Barrie Peterson and that he has used these entities to evade his personal obligations, these facts are insufficient to justify the appointment of a receiver. This is so because under Virginia law, the ap-

pointment of a receiver is generally for the purpose of overseeing the liquidation or dissolution of an entity. While exceptions to this rule exist, these exceptions are limited to factual circumstances not present here. *See, e.g., Securities & Exchange Commission v. Bowler,* 427 F.2d 190 (4th Cir.1970) (appointment of receiver is necessary to protect public interest where corporation has violated provisions of federal securities laws). Accordingly, plaintiffs' demand for appointment of a receiver must be denied.

58. Plaintiffs also request attorney's fees and costs. This request will be postponed pending resolution of any appeal of this matter. If no appeal is taken, or after disposition of any appeal, if appropriate, a schedule will be established for the submission of a fee petition and further briefing by the parties on this issue.