**TOP FLIGHT AVIATION, INC.**

v.

**WASHINGTON COUNTY REGIONAL AIRPORT COMMISSION, et al.**

No. CIV.A. WMN–99–2581.

United States District Court,
D. Maryland.

March 21, 2002.

Warren K. Rich, James J. Doyle, III, Rich and Henderson PC, Annapolis, MD, for Plaintiff.

Dennis M. Ettlin, Brown and Sturm, Rockville, MD, for Defendants.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court are cross motions for summary judgment. Paper Nos. 82 (Plaintiff's); 83 (Defendant Aero–Smith, Inc.'s) and 84 (motion of Defendants Hagerstown Regional Airport Advisory Commission, Board of County Commissioners of Washington County, and Carolyn Motz). The motions are fully and exhaustively briefed. Upon a review of the motions and the applicable case law, the Court deter-

mines that no hearing is necessary (Local Rule 105.6) and that Defendants' motions shall be granted, and Plaintiff's denied.

## I. FACTUAL BACKGROUND

This case arises out of the manner in which aircraft refueling operations are regulated at the Hagerstown Regional Airport (Airport). The Airport is owned and operated by Defendant Board of County Commissioners of Washington County, Maryland (County Board). Defendant Hagerstown Regional Airport Advisory Commission (Commission) promulgates and enforces the regulations concerning which entities may operate on airport property. Defendant Caroline Motz is the current manager of the Airport. (The County Board, the Commission and Motz are hereinafter referred to as "the County Defendants.")

Plaintiff Top Flight Aviation, Inc. is a Maryland corporation that operates an aircraft refueling business on the premises of Top Flight Airpark (Airpark), a parcel of property located immediately adjacent to the Airport. A taxiway connects the Airport and the Airpark and airplanes use that taxiway to access Top Flight's services. In order to have this access, Top Flight is assessed a fuel flow fee by the Airport, based on gallons of fuel sold by Top Flight.

Top Flight's current President, sole shareholder, officer, and director is Scott Peterson. Scott Peterson's father, Barrie Peterson, was Top Flight's incorporating director and the sole shareholder until he began giving his ownership interest over to Scott in 1990, and eventually gave over complete ownership in 1992. Barrie was also an officer and director of Top Flight until 1996. The Airpark property leased by Top Flight is owned by First Flight, L.P. (First Flight), which also owns the fuel tanks and tank trucks used by Top Flight. Scott and Barrie Peterson each own a 49% interest in First Flight.

Defendant Aero–Smith, Inc. is also in the business of supplying aircraft fuel and related services to airplanes using the Airport. Unlike Top Flight, Aero–Smith operates out of facilities located on Airport property and is an "into-plane refueler," i.e., its fuel trucks are permitted to drive out to the airplanes in order to refuel them. Aero–Smith pays the same fuel flow fee as Top Flight.

Top Flight filed this action to obtain an order of the Court requiring the County Defendants to allow Top Flight to come onto Airport property to offer refueling services, and also to recover damages from Defendants' alleged wrongful denial of access in the past. Top Flight asserts violations of §§ 1 and 2 of the Sherman Act, denial of due process and equal protection, violation of Article 41 of the Maryland Declaration of Rights, and tortious interference with business relations. A brief history of the relationships amongst the parties is helpful in placing Top Flight's claims in their proper context.

Top Flight Aviation began its operations in the 1980s. In 1988, the Commission and County Board began to impose fuel flow fees on all "fixed based operations" (FBOs),[1] located either on or off of airport property. The parties, including Top Flight, agreed at that time that the fuel flow fee was the fairest means of collecting revenue to support the Airport's operational costs.

In 1989, the Commission established certain "Minimum Operating Standards, Rules and Regulations" (Minimum Standards) for all entities that would engage in aeronautical activity on Airport property. The Standards were adopted pursuant to the County Board's statutory authority to

---

1. An FBO is an entity authorized to deliver fuel or other aviation services.

"establish and operate" an airport and "lease or grant to any person, on the terms and conditions it considers proper, any right or interest in the airport or facility." Md.Code Ann: Transp. I § 5–418(a)(1)–(2). These Minimum Standards were revised in 1995 and the revised standards state that they are to apply to "everyone using the Airport and shall be observed in the interest of safety, security and the financial well being of the parties." Minimum Standards, 1995 Revision, County Defs.' Exh. 2 at 1.

Included in the 1989 Minimum Standards are provisions that would seem to imply that, in order to operate as an FBO on Airport property, it is necessary to lease property on the Airport property itself. The Standards define an FBO as "a person or corporation who has entered into a lease agreement with the [Commission] establishing Airport space lease terms...." 1989 Minimum Standards, County Defs.' Exh. 1 at 8. They also provide that "an FBO may provide or conduct only those services for which he has executed a lease agreement." Id. While Top Flight acknowledges that it has never applied to become an FBO, it now opines that if such an application had been made, it would have been denied because Top Flight has never leased property on Airport property.

In February 1990, the Commission issued what Top Flight has characterized as a "policy statement that limited Top Flight Aviation to refueling on Airpark property only." Pl's Motion at 6. This "policy statement" is actually a brief entry in the minutes of the February 1990 Commission meeting which states, *in toto,*

> *Topflight -Fuel Flow Fee Versus Access (User's Fee):*
> The Commission reiterated their position concerning an agreement with Topflight Airpark in that Topflight Airpark would be allowed to function as a fixed based operator selling fuel on their property, with the standard four cent fuel flow fee, but would not be allowed to operate on the airport itself. Their operations would strictly be limited to their property.

Commission Minutes, February 14, 1990, Pl's Exh. 6 at 4. Regardless of the import of this statement, it is clear from the record that, at least through the first half of the 1990s, Top Flight "wasn't particularly concerned about going onto the Airport property." Scott Peterson Dep. at 196. According to Scott Peterson, the issue of Top Flight's access to Airport property did not "come to a head" until "probably '97'ish." Id. at 197.

Well before that, in 1993, Defendant Aero–Smith expressed interest in operating as an FBO on Airport property, to replace the on-property FBO that was then in operation. Aero–Smith submitted a written bid proposal to the County Board, and Aero–Smith principals met with the Commission, the Airport Manager, and the County Attorney. Aero–Smith's bid was eventually approved and the Commission and Aero–Smith entered into a Fixed Base Operations Agreement on June 21, 1993. Fixed Base Operation Agreement, Aero–Smith's Exh. 3. The agreement was subject to the restrictions and conditions of the Minimum Standards. Id. at 2. Pursuant to the agreement, Aero–Smith and Waynesboro Design Partnership constructed a facility on Airport property from which to conduct Aero–Smith's business, including a hanger, fuel farm and office building. Under the terms of the agreement, the ownership of all these facilities will revert to the Airport in 2013.

In addition to challenging the denial of Top Flight's access onto Airport property, Top Flight's Amended Complaint also raises claims of tortious interference with business relations related to several gov-

ernment refueling contracts. Military and other federal government aircraft frequently land at the Airport and require refueling and other services. To provide for these services, the United States Defense Logistics Agency (DLA) solicits bids from and awards contracts to refuelers, generally for two-year terms. Top Flight successfully bid for the DLA contracts for the years 1990 through 1992 and 1992 through 1994. In 1994, the contract was awarded to Aero–Smith.

In 1996, when the DLA was preparing to solicit bids for the contract to be awarded in 1997, the DLA sent a letter to the Airport's Manager, Defendant Motz, stating, "[t]he Defense Fuel Supply Center has a requirement for into-plane refueling for military and federal civilian agency aircrafts at your airport. To ensure that all Fixed Based Operators have the opportunity to submit an offer to provide the supplies and services, we would like your assistance in identifying all operators at your airport which are capable of refueling aircraft." Sept. 11, 1996 Letter from DLA contracting Officer to Motz, Aero–Smith's Exh. 6. Motz responded by completing the form provided, listing only Aero–Smith. She also added an additional comment, stating:

> * Please note that Aero–Smith, Inc. is the only authorized fueller at this Airport. Others who may apply for this contract are not in compliance with Airport rules, regulations and Minimum Standards. Further, others who may apply are not permitted on Airport property for any refueling or other commercial endeavor as a result of noncompliance with Minimum Standards. Please call me directly if you have any questions or concerns.

Aero–Smith's Exh. 7.

The 1997 contract was initially awarded to Aero–Smith. When Top Flight learned of the award, however, Top Flight lodged a formal protest and the DLA reopened the competition and commenced a pre-award investigation of Top Flight. In the course of that investigation, the DLA uncovered numerous problems with Top Flight's operations, the most serious being fuel quality concerns. Matthew Schuster, the DLA contract specialist responsible for the decision awarding the 1997 contract, concluded that the first survey of Top Flight's operation was "one of the worst surveys that [he] had ever seen come back on anybody." Schuster Dep. at 61, County Defs.' Exh. 32. While a second survey revealed that Top Flight had addressed many of the deficiencies identified in the first survey, DLA's concerns about Top Flight's operations were not assuaged. The author of the second survey stated:

> the corrective actions performed in order to satisfy the Preaward Survey Team is nothing more than an attempt to establish a look of professionalism and responsibility, to secure this contract. These corrections were not made as a result of responsible, moral or professional obligations, but out of necessity. Pumping algae laden fuel into aircraft from dirty tanks and a discrepancy burdened fuel truck did not seem to bother [Top Flight] for years.

May 23, 1997 Survey, County Defs.' Exh. 33. at 3.

The DLA let stand its award of the 1997 contract to Aero–Smith.

When the DLA contract came up for renewal in 1999, Top Flight competed again and this time was awarded the contract. After the award to Top Flight, Aero–Smith lodged a protest. As part of the preparation of his protest, the President of Aero–Smith sent a letter to Motz asking her to "[p]lease advise me what businesses are authorized to provide into-plane supplies and services at Hagerstown Regional Airport." June 10, 1999 letter

from George Smith to Motz, Aero–Smith's Exh. 9. Motz responded with a letter dated June 15, 1999, stating that Aero–Smith was the only business authorized to provide into-plane supplies. Aero–Smith Exh. 9. The letter also made mention of Top Flight's operations.

Notwithstanding Aero–Smith's protest, the 1999 award to Top Flight was not disturbed. The DLA sent a letter to Aero–Smith responding to the protest and stating that "the contract does not prohibit Government aircraft from taxiing to private property adjacent to the airport." Aero–Smith Motion Exh. 11 at 2. Top Flight continues to hold the DLA contract.

## II. LEGAL STANDARD

A moving party is entitled to summary judgment only if it can show that there exists no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Blue Ridge Ins. Co. v. Puig,* 64 F.Supp.2d 514 (D.Md.1999) (citing, *inter alia, Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

When both parties file motions for summary judgment, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment")(emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.,* 627 F.Supp. 170, 172 (D.Md.1985)(quoting Charles A.

Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed.1993)).

## III. DISCUSSION

In moving for summary judgment, the focus of Top Flight's argument is that it is unfair to prohibit it from going onto Airport property to refuel aircraft when it pays the same fuel flow fee as Aero–Smith. Top Flight contends that this prohibition is "anti-competitive, in restraint of trade, and has created a monopoly on refueling on the Airport. Moreover, claims Top Flight, Defendants have engaged in additional anti-competitive practices by attempting to prevent the award of government refueling contracts to Top Flight Aviation, to interfere with those contracts, and to interfere with Top Flight Aviation's opportunity to refuel private aircraft." Pl.'s Motion at 2.

In their cross-motions for summary judgment, Defendants raise numerous arguments as to why they are entitled to judgment on all of Top Flight's claims. Those arguments include, *inter alia:*

1) Defendants are immune from any anti-trust liability under the "state action" doctrine.

2) Top Flight has failed to establish the requisite elements of an anti-trust claim. Specifically, Top Flight offers no probative evidence that Defendants conspired together to keep Top Flight out of the relevant market. Any inference of such a conspiracy is undermined by the fact that, according to Top Flight's history of the events, the determination to keep Top Flight off Airport property was made three years before Aero–Smith even came into existence.

3) Top Flight's § 1983 claim is barred by the three year statute of limitations. Again, according to Top Flight, the determination that it would not be allowed on Airport property was made in 1990. This action was not filed until 1999.

4) Top Flight's § 1983 due process claim fails as Top Flight has no constitutionally protected property interest in access to the Airport property.

5) Top Flight's § 1983 equal protection claim fails as Top Flight is not a member of a protected class.

6) Top Flight's tortious interference claim fails as against the County Defendants because Top Flight failed to give timely notice as required under the Local Government Tort Claims Act.

7) The tortious interference claim also fails because Top Flight has offered no evidence of improper or wrongful conduct.

■ While most, if not all, of these arguments would provide valid grounds for entering judgment in favor of Defendants on Top Flight's claims, the Court need not address them here, for the Court finds that one additional argument raised by Defendants provides a more compelling reason to reject the majority of Top Flight's claims. That argument is that Top Flight is simply not now, nor has it been during the relevant time period, able to meet the Minimum Standards required of entities doing business on Airport property.

The Minimum Standards allow that an application can be denied where:

b. The applicant's proposed operations . . . will create a safety hazard on the Airport.

.  .  .  .  .

i. Any party applying, or having an interest in the business, has defaulted in the performance of any lease or other agreement with the local entity . . .

j. Any party applying, or having an interest in the business, has a credit report which contains derogatory information and does not appear to be a person of satisfactory business responsibility and reputation.

k. The applicant does not have the finances necessary to conduct the proposed operation for a minimum period of six months.

1989 Minimum Standards at 7–8.

In addition, the Washington County Code requires the County Board to enter contracts only with "responsible bidders." Wash. Co.Code of Pub. Laws § 1–106(b). While the Code does not expand on the meaning of "responsible," the Federal Acquisition Regulations provide a helpful definition: "To be determined responsible, a prospective contractor must . . . (d) [h]ave a satisfactory record of integrity and business ethics including satisfactory compliance with the law including tax laws, labor and employment laws." 48 C.F.R. 9.104–1.[2]

County Defendants have provided the Court with numerous reasons why Top Flight could be considered not "responsible." *See* County Defendants' Motion at 6–36; County Defendants' Reply at 5–11; County Defendants' Opp. to Top Flight's Motion at 12–17. As summarized by the County Defendants, these reasons include:

1) Numerous federal court judgments have issued findings that Scott and Barrie Peterson and their various companies have repeatedly engaged in "fraudulent" transfers, "fraudulent" conveyances, "shell corporate schemes," the "fabrication" of legal defenses for

**2.** Noting that the term "responsible" is not defined in the Minimum Standards, Top Flight argues that "it is simply not appropriate to attempt to judge Top Flight Aviation on the basis of another agency's regulations." Pl.'s Opp. at 5. Instead, Top Flight offers its own definition for the term: "Those stan-

dards simply require commercial operators to be of a satisfactory business responsibility and reputation." The Court finds this a distinction without a difference and that Top Flight would clearly fail, even under its own definition.

litigation, the "orchestration" of various "schemes" in order to "funnel" and "siphon" millions of dollars in business assets for their personal uses, and other unethical conduct. . . .

2) Top Flight, First Flight, Barrie Peterson and numerous Peterson controlled entities repeatedly failed to pay Federal, State (Maryland and Virginia), and Local taxes, over the past 15 years. . . .

3) Top Flight repeatedly did not pay Airport fuel flow fees, resulting in several collection suits before payment finally was made on the eve of a sheriff's sale, and defaulted on its written settlement agreement with the Board. . . .

4) Top Flight, Scott and Barrie Peterson controlled entities have had dozens of judgments totaling tens of millions of dollars entered against them over the past 15 years. . . .

5) Five Scott and Barrie Peterson controlled entities have filed bankruptcy . . ., as well as Barrie Peterson individually. . . .

6) Barrie Peterson runs 30 companies out of one of his offices, and uses corporations as the sole general partners in his partnerships. . . . The Petersons have five companies that go by the name "Top Flight" alone: the Plaintiff, Top Flight Aviation, Inc.; Top Flight Air Park, Inc; Top Flight Realty, Inc.; Top Flight Limited Partnership; and Top Flight Airpark, the name by which First Flight does business.

County Defs.' Motion at 10–11. In addition, the County Defendants point to the

fuel contamination problems, discussed above, as grounds for concluding that Top Flight, at least for a portion of the relevant time period, did not meet the Airport's Minimum Standards.

County Defendants provide more than ample support for each of these grounds for finding Top Flight not a responsible entity. The most compelling support, perhaps, comes from the numerous judicial decisions issued by judges in the United States District and Bankruptcy Courts for the Eastern District of Virginia, rehearsing the financial and ethical improprieties of the Petersons and Peterson entities. *See C.F. Trust v. Barrie Peterson, Scott Peterson, Jubal, Inc.,* Civil Action No. 96–1128–A, 1996 WL 33165192 (E.D.Va. December 9, 1996)(finding that conveyance from Barrie and Nancy Peterson (Scott's mother) to Scott controlled entity was fraudulent conveyance intended to shield Barrie from legitimate creditors); *C.F. Trust v. Barrie Peterson, Scott Peterson,* Civil Action No. 97–2003–A, 1999 WL 33456231 (E.D.Va. January 8, 1999)(finding that the Petersons, by "treating [their] ostensibly separately owned corporations as interchangeable entities to be manipulated at will," sought to fraudulently "create the appearance of encumbrances to frustrate legitimate creditors from collecting on their own debts," Slip Op. at 12); *C.F. In re DEP, Inc.,* Adversary No. 97–1017, 1997 WL 1507390 (Bkrtcy.E.D.Va. Oct. 31, 1997)(finding that Barrie and Scott Peterson orchestrated a sham transaction in order to shield Barrie's assets from legitimate creditors);[3] *C.F. Trust, Inc. v.*

---

**3.** In reaching this conclusion, the bankruptcy court made a rather pointed, and memorable, assessment of the Petersons' general credibility:

the court has already had an opportunity to assess the credibility of Barrie Peterson during the three-day hearing on relief from the automatic stay. To put the matter char-

itably, truth is not the brightest star in Mr. Peterson's constellation, and the court would not be inclined to give any credence to Mr. Peterson's denials that he supplied the funds to purchase the judgment. Nor, it might be added, does the deposition testimony of Scott Peterson assist J.P. Development's position. The younger Mr. Peter-

*First Flight Limited Partnership,* 140 F.Supp.2d 628 (E.D.Va.2001)(finding that Scott and Barrie Peterson siphoned funds through Scott Peterson controlled entities to pay Barrie's personal expenses, in violation of numerous charging orders from Barrie's creditors).

Top Flight offers little in the way of a direct challenge to these concerns raised by the County Defendants. Top Flight specifically acknowledges the problems with the fuel tanks in 1997 (although it seeks to minimize the significance of the problems), concedes that it had "tax problems" and does not contest that it has not always paid its fuel flow fees in a timely manner. *See* Pl's Mot. at 6–7. Regarding the fuel flow fees, Top Flight continues to defend actively its refusal to timely pay those fees. In its pleadings, it protests, "it certainly would not be unreasonable for an off-airport operator, such as Top Flight Aviation, to refuse to pay fuel flow fees when it was assessed the identical fee as the Airport-based FBO, but was specifically denied access to the Airport property." *Id.* at 8.[4]

■ Rather than directly challenge Defendants' litany of improprieties, Top Flight offers several arguments to avoid the ramifications of its conduct. First, Top Flight argues that the financial problems of other Peterson entities cannot be attributed to Top Flight. To the contrary,

While it is true that a corporation generally is to be viewed as separate and distinct from its stockholders, it is equally true that a corporation can operate only through the individuals who, as officers, directors, or stockholders, control the activities, policies, and management of the corporation. It follows that the integrity of a corporation can be no greater than the integrity of the individuals who control its operation.

*Warren Bros. Roads Co. v. United States,* 173 Ct.Cl. 714, 355 F.2d 612, 616 (1965) (citation omitted). This is particularly true where, as here, Scott and Barrie Peterson seem to have consistently chosen to ignore corporate forms whenever it particularly suited their self-serving schemes. Furthermore, the Minimum Standards themselves state that an application can be denied based upon information related to any party "having an interest in the business" of the applicant. 1989 Minimum Standards at 8.

■ Top Flight next complains that the County Defendants are applying a "bias and double standard" because they did not request the submission of financial data from Defendant Aero–Smith.[5] Again, the Court disagrees, this time with Top Flight's factual conclusions. The County Defendants have submitted the testimony of Rodney Shoop, the Airport manager at the time that Aero–Smith was granted the

son's testimony as to the source of the funds used to purchase the judgment is an astonishing mass of evasion. It is not often that a trier of fact can make a credibility determination based on a cold transcript, but in this particular case there can be no doubt, based on the deposition transcript, that the younger Mr. Peterson had no intention of giving straight answers to straight questions or of supplying relevant information concerning the transaction. 1997 WL 1507390 at *11 n. 17.

4. The Court is not convinced that this fuel flow fee arrangement is inequitable. In addi-

tion to the fuel flow fee, Aero–Smith has constructed and maintains a state of the art fuel farm and FBO facility which will revert back to the County in 2013. According to Defendants' expert, the value of this facility is $600,000. Regardless, it is not for Top Flight to unilaterally decide that it need not pay the fees it has undeniably agreed to pay.

5. Notably, Top Flight does not offer any evidence, nor does it even allege, that there is any information about Aero–Smith or its principals that would have led to the denial of its application.

FBO contract. Shoop testified that he and the Commission "met many times with the proposers [of the Aero–Smith venture] where we obtained information to build a level of satisfaction that they could perform the function of an FBO operator on the airport to meet our requirements and provide those services that we were requiring an FBO operator to provide." Shoop Dep. at 17. He further testified that, as part of this inquiry, the Commission looked at the financial information of George Smith, Aero–Smith's president, "to help us determine the financial integrity or ability of this company to perform the requirements. . . ." *Id.* at 20. Smith also testified that he provided, at the request of the Commission, "documents showing [his] personal financial information, including but not limited to [his] individual tax returns and other financial records" for review of the Commission. George Smith Aff. at ¶ 4. Top Flight offers no evidence to refute any of this testimony.[6]

■ Plaintiff next argues that the County Defendants' current reliance on the Minimum Standards "is simply pretext put forward as an after-the-fact justification." Pl.'s Opp. at 8. Top Flight asserts that much of the financial information upon which Defendants now rely was not made known to Defendants until it was revealed in the course of this litigation. Again, Top Flight's characterization of the facts is not supported by the record.

With their opposition to Plaintiff's Motion, the County Defendants supplied a year by year summary of what they knew about Top Flight, and when they knew it. The summary is well supported by the record. The Court will quote the summary here, at length, both because it refutes Top Flight's contention that this is all recently acquired knowledge, but also because it provides additional detail as to the reasons that Top Flight was not a responsible entity.

1989 The minutes of the meeting of the Hagerstown Regional Airport Advisory Commission on December 13, 1989 state: "Top Flight—the foreclosure sale scheduled for 2 January was discussed."

1990 From July 1990 to June 1991, Top Flight failed to pay the fuel flow fees that it owed. There was also a Mechanic's Lien and a foreclosure sale scheduled for 1990, as well as final legal notices for failure to pay taxes.

1991 The Board filed suit against Top Flight for non-payment of fuel flow fees. In August of 1991, Top Flight again failed to pay fuel flow fees, nearly another year passed without payment.

1992 First Flight, L.P., which owns Top Flight's fuel tanks and owns the property on which it operates, filed bankruptcy. Mr. Shoop was aware of the newspaper articles about the foreclosure and bankruptcy. The County Attorney would have been aware of the bankruptcy and kept track of that. The Defendants knew that Top Flight and the Airpark w[ere] all one big operation[,] that the employees were all intermingled and that the decision-maker in this business . . . was Barrie Peterson.

1994 From May of 1994 to April of 1997, Top Flight failed to [pay] fuel flow fees. Carolyn Motz was aware of the fuel flow payment issue with Top Flight.

---

**6.** Top Flight premises its argument primarily on Defendants' inability to provide comprehensive documentation supporting the testimony that Shoop and the Commission investigated the financial integrity of Aero–Smith. In response, the County Defendants note that it was eight years between the time the contract was awarded and Shoop's deposition. County policies require that files be routinely cleaned out. This loss of complete documentation highlights the prejudice to Defendants of Top Flight's long delay in bringing this action.

**976**

Airport policy required fuel flow reports and fees to be submitted on a monthly basis, so the Defendants were continuously aware of Top Flight's failure to submit reports and payments each month from 1994 through 1997.

1995 The Board filed suit against Top Flight for failure to pay the fuel flow fee. Regarding a separate suit [ ] filed by the County treasurer against Top Flight in 1995 for non-payment of Washington County taxes, Mr. Shoop testified that someone in the County would have known about it.

1996 Top Flight breached its settlement agreement with the Board. In May of 1996, the Board filed a Confessed Judgment action against Top Flight for breach of the settlement agreement.

1997 The Board had to execute on Top Flight's property and had the constable levy it in order to obtain payment of fuel flow fees and monies due under the settlement agreement. Regarding a notice of lien for unpaid taxes of Top Flight filed in 1997, Mr. Shoop testified that the Airport manager [or] county attorney would have been aware of this.

County Defs.' Reply at 14–16 (quotations and references to the record, omitted).

■ Top Flight's argument that the County Defendants were not aware of its financial condition, while factually inaccurate, actually highlights what might constitute one of the most significant ways in which Top Flight failed to satisfy the Minimum Standards, i.e., that Top Flight has never made application to operate on Airport property. Again, Scott Peterson concedes that Top Flight never filed an application, even while acknowledging that Motz sent him an application, along with

the Minimum Standards, in 1997 when he became interested in operating on Airport property. Peterson Dep. at 197–199.[7] Considering the investigation that attended Aero–Smith's application, it is clear that, had Top Flight applied, the County Defendants would have discovered then most of what they discovered through this litigation.

Top Flight's Sherman Act and § 1983 claims are all premised on the contention that Top Flight was wrongfully denied access to Airport property. In light of the overwhelming evidence that Top Flight was not an entity that would have met the Airport's Minimum Standards for operating on Airport property, had it chosen to apply, the Court finds that Defendants are entitled to summary judgment as to these claims.

■ Turning to the remaining tortious interference claim, the Court finds that Top Flight is unable to show any legally cognizable injury attributable to Defendants' actions. Regardless of whatever information Motz may have furnished to the DLA in anticipation of the award of the 1997 contract, Top Flight could not have been awarded the contract because of the serious safety concerns unveiled through the DLA's investigation. Motz's failure to identify Top Flight as a potential bidder simply made no difference. As to the 1999 DLA contract, Top Flight retained the contract despite Aero–Smith's formal protest. If there was anything improper about that protest, or Motz's role in providing information to Aero–Smith (which the Court believes there was not), it made no difference in the ultimate outcome of the contract award.

7. Interestingly, as part of its argument that the County Defendants were deficient in properly processing the application of Aero–Smith, it concedes that this requirement is part of the Minimum Standards. Pl's Opp. at 12 ("County procurement requirements, as well as the Airport minimum standards, require that a person wishing to conduct commercial activities submit certain financial information to the County.")

## IV. CONCLUSION

For the above stated reasons, the Court finds that the Defendants are entitled to judgment as to all claims brought in the amended complaint. A separate order consistent with this memorandum will issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this      day of March, 2002, by the United States District Court for the District of Maryland, ORDERED:

1. That Plaintiff's Motion for Summary Judgment, Paper No. 82, is DENIED;

2. That Aero–Smith, Inc.'s Motion for Summary Judgment, Paper No. 83, is GRANTED;

3. That the Motion for Summary Judgment of The Hagerstown Regional Airport Advisory Commission, the Board of County Commissioners of Washington County, Maryland, and Carolyn Motz, Paper No. 84, is GRANTED;

4. That judgment is entered in favor of Defendants and against Plaintiff,

5. That this action is hereby CLOSED;

6. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

7. That the Clerk of the Court shall mail or transmit copies of the foregoing Memorandum and this Order to all counsel of record.