## Richmond

RENNER PLUMBING, HEATING AND AIR
CONDITIONING, INC., ET AL.

V.

CONNIE I. RENNER

June 17, 1983.

Record No. 801592.

Present: All the Justices.

*David J. Andre' (Oscar J. Andre'; Larrick, White, Andre' & Rabun*, on briefs), for appellants.

*Thomas A. Schultz, Jr. (William A. Johnston; Harrison & Johnston*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this action brought on a written contract, the dispositive question is whether parol evidence properly was admitted at the trial.

In a second amended motion for judgment in this suit filed almost nine years ago, appellee Connie I. Renner, the plaintiff below, sought approximately $57,000 damages, for breach of a contract dated June 28, 1968, from appellants Renner Plumbing, Heating and Air Conditioning, Inc., Hugh T. Campbell, and Lloyd R. Renner, defendants below. After a protracted period of pleading, during which a counterclaim was filed, and after extensive discovery proceedings, the case was tried to a jury in June 1980. The trial court struck the defendants' evidence on the counterclaim. The jury rendered a verdict in favor of the plaintiff for

$25,351.90, with interest, and we awarded defendants this appeal to the July 1980 judgment order entered on the verdict.*

The facts leading up to preparation of the contract in question are not in dispute. Connie Renner, with the aid of his wife, operated a plumbing business in the Winchester area beginning in 1937. He worked as a sole proprietor until 1961 when he incorporated and formed Renner Plumbing, Heating and Air Conditioning, Inc. Initially, Connie and his wife owned all the stock of the corporation. Later, a few shares were transferred to employees Lloyd Renner, who was Connie's nephew, and Hugh Campbell, a trusted friend.

In 1968, Connie, desiring "to get out of this rat race," decided to sell the business to Lloyd and Campbell, who had no independent income with which to finance the purchase. Connie asked the corporate attorney, Joseph W. White, deceased at the time of trial, to prepare the necessary documents for completion of the sale. White also represented Connie personally.

White drew two contracts that were executed on June 28, 1968. One contract, not in dispute, was between Connie and his wife, on the one hand, and Lloyd, Campbell, and Commercial Savings Bank, trustee, on the other. That agreement, amended about six months later, provided for sale of the Renners' stock to the corporation for $50,000 payable in monthly installments of $555.20, including interest, with the entire purchase price to be paid by July 1, 1978. That contract has been fully performed.

The other agreement, the focus of this dispute, provides in pertinent part as follows:

"AGREEMENT made this 28th day of June, 1968, between Connie I. Renner, hereinafter called Renner, Renner Plumbing, Heating & Air Conditioning, Inc., a Virginia Corporation, hereinafter called the Corporation and Hugh T. Campbell and Lloyd R. Renner, hereinafter called Campbell and Renner

"IN CONSIDERATION of the services which Renner has heretofore rendered to the Corporation, and in considera-

---

* At the outset, we will dispose of two issues argued by defendants. They claim the trial court erred in admitting evidence that varied from the allegations of the plaintiff's pleadings, and that the court erred in striking the counterclaim. Neither of these issues has been stated in the assignments of error with the specificity required by our rules of appellate procedure. Thus, we will notice these contentions no further. Rule 5:21.

tion of services to be rendered by him, the Corporation agrees to employ Renner as an advisor under the following terms and conditions:

"(1) Until May 29, 1975 [Connie's 65th birthday], the Corporation will pay Renner a salary of One Hundred and Twenty-five Dollars ($125.00) per week. If the annual net profit of the Corporation shall exceed Five Thousand Dollars ($5,000.00), the Corporation will also pay to Renner ten per centum (10%) of its annual net profit. The annual net profit of the Corporation shall be its operating profit, as computed by its accountants, before accruals for income tax liabilities, bonuses or contributions to profit sharing or pension plans, but after the normal reasonable allowances for depreciation for tax purposes, to exclude additional first year allowances for depreciation allowed by Section 179 of the Internal Revenue Code.

"(2) Renner's salary shall be increased or decreased to cover the effects of inflation or recession after the first year following the execution of this agreement. In computing the amount of any increase or decrease the Consumer Price Index prepared by the U.S. Department of Labor shall be used.

"(3) After May 29, 1975, the Corporation will pay to Renner for life the maximum sum which could be earned by him without invading his right to receive full Social Security benefits, not to exceed Two Thousand Dollars ($2,000.00) annually.

* * *

"(5) The Corporation agrees that it will pay no bonuses, commissions, contributions to retirement plans or dividends on any common stock of the Corporation, during any year in which the annual net profits of the Corporation are less than Five Thousand Dollars ($5,000.00). This provision shall not be construed to prohibit the payment of dividends on the Corporation's preferred stock in any event.

"(6) The Corporation will furnish Renner either a Ford, Chevrolet or Pontiac automobile for his use until May 29, 1975.

"Campbell and Renner, in consideration of the premises, join in this Agreement for the purpose of ratifying and confirming the action of the Corporation, and Agree to be indi-

vidually bound to perform the obligations of the Corporation set forth herein."

After the contracts were executed, Connie continued for a short period as President of the corporation and thereafter was Treasurer. He was provided office space on the business premises and reported to the office fairly regularly for several years. During the period, his interest in the business affairs diminished and there was a feeling on Connie's part that he was not treated with proper respect by some of the employees. He also had the impression that Campbell and Lloyd did not desire his participation.

On October 27, 1971, Connie suffered a stroke which severely restricted his activities. After that event, he no longer participated in the operation of the business.

From the time the employment agreement was executed through August 5, 1974, Connie was paid his weekly salary by the corporation pursuant to paragraph (1) of the contract. He filed the present action on July 19, 1974. The corporation terminated payments to plaintiff on the advice of counsel because of the "litigation."

In the second amended motion for judgment, plaintiff recited the employment contract, emphasizing the portion of paragraph (1) dealing with payment of the ten percent share of annual net profit. Connie alleged that when the agreement was executed the salaries of Campbell and Lloyd were $139 per week each. He asserted it was the intent of the parties that the net-profit computation for the purpose of determining the ten percent share due him under paragraph (1) would be made without deducting from profits any sums paid as salary or bonus to Campbell and Lloyd in excess of $139 per week each. He alleged that for the fiscal years 1969 through 1975 the defendants each received more than $139 per week. Consequently, he asserted, the deductions for salaries paid them were excessive in determining net profits within the meaning of paragraph (1). Admitting that he was paid bonuses for some of the years during the period, plaintiff alleged that, because of the excessive deductions, he was underpaid during such years and failed to receive any payments during other years when they were due.

In addition, plaintiff sought recovery for unpaid weekly salary from August 5, 1974 to May 29, 1975, the date of his 65th birthday. Also, Connie claimed nonpayment of the $2,000 sums pro-

vided in paragraph (3) of the agreement. Asserting defendants had advised that no such payments would be made, plaintiff alleged defendants had been guilty of an anticipatory breach of that paragraph.

At trial, Connie did not testify in person. His de bene esse deposition, taken four years before trial and about four and one-half years after his stroke, was read in its entirety to the jury. Over defendants' objections, the jury was permitted to hear Connie's testimony: that the total purchase price of the business was not $50,000 but $80,000, with a $50,000 value placed on the merchandise, equipment, and accounts receivable; that business goodwill was valued at $30,000; that the employment agreement was drawn to enable him to receive the $30,000 payment for sale of the goodwill; that he was to perform no specific duties under the contract in order to be entitled to the payments provided in paragraph (1); and that Campbell and Lloyd were not authorized under the contract to increase their own salaries without prior approval of the plaintiff.

Defendants contend the trial court should have excluded this testimony because it altered, varied, and contradicted an unambiguous written agreement. Defendants argue that the subject matter of the transaction, as demonstrated by the other June 28, 1968 agreement, was the sale of the stock of the corporation, not its assets. In addition, defendants urge, there is no mention anywhere of transfer of "goodwill" for $30,000 or for any other figure. Also, they argue, plaintiff's testimony about the nature of his duties as an "advisor" and whether defendants unilaterally could raise their own salaries served to vary the terms of a contract "which speaks for itself."

Plaintiff contends the reason the contract contains no description of his duties as "advisor" is because the payments to be made to Connie under the two agreements constituted payment of the total purchase price. Therefore, Connie says, he had "no real work to perform in order to be entitled to the benefits" under the contract in dispute.

Nevertheless, plaintiff says, it was proper for the trial court to permit testimony about his minimal duties to show the nature of his affirmative and negative responsibilities. Connie testified that under the contract he was not required to "go around and pick up materials," that he was not required to fulfill certain assignments

on specific jobs on which the company was working, and that he was not obligated to report to the office each day.

Plaintiff contends, in addition, that defendants should not be entitled to a reversal of the case based on admission of extrinsic evidence describing his duties as an "advisor." He notes that such facts were proved by other competent testimony to which defendants did not object. For example, defendants made no objection to plaintiff's testimony that he had only "one duty" as "advisor" under the contract, which was to be available to advise Campbell and Lloyd "if there was any trouble of any kind." Also, no objection was made to Connie's testimony that he was to "see" old customers "to keep goodwill up," and that he performed this duty until he had the stroke.

In reply, defendants argue that "the controlling issue" in the case is not whether parol evidence relating to the meaning of "advisor" was properly admitted. Instead, they say, "the principal issue" is whether extrinsic evidence bearing on the computation of "net profit" was properly received. Implicitly conceding in the reply brief that parol evidence as to the meaning of "advisor" was proper, defendants contend that admission of such evidence for that limited purpose should not serve "as a wedge to open the door" for wholesale introduction of extrinsic evidence defining the manner net profits are to be computed. Defendants note paragraph (1) provides that the "annual net profit of the Corporation shall be its operating profit, as computed by its accountants." Defendants contend the evidence showed that such accountants made the computations precisely according to the terms of the contract and in conformity with instructions from attorney White contained in a letter exhibit dated in November 1968. Defendants argue that plaintiff's testimony and his other evidence about the manner the net profit was computed contradicted the company's accountant, who said the amount was properly determined, "thus changing the contract completely."

This portion of the controversy centered around the manner in which the stock was purchased under the other agreement. Originally, the company accountant thought the stock would be paid for wholly with corporate funds. Later, however, White advised in the November letter that, in order to minimize corporate taxes, a different device should be used for payment. Initially, the company would make the monthly payments to Connie. Then at the end of each year the total amount so paid would be charged to

Campbell and Lloyd as income to them and reported in their income tax returns. Such sums were in addition to the regular weekly salary payments made to Campbell and Lloyd. These year-end payments were made in cash or applied to reduce an account receivable, a loan account, that previously had been established on the books of the corporation in the name of each individual defendant. The dispute was whether these year-end payments were "salaries," to be deducted in computing "annual net profit," or "bonuses," within the meaning of that term in paragraph (1), not to be deducted in arriving at "annual net profit." If they were "bonuses," of course, the plaintiff would realize a larger sum as his ten-percent payment under paragraph (1) than he would receive if the year-end payments to defendants were "salaries."

It is apparent from the amount of the verdict of $25,351.90 that the jury decided the year-end payments were "bonuses." The amount of the $2,000 annual payments for five years (1975-1980) was not disputed and totals $10,000. The amount of the weekly salary due Connie from August of 1974 to May 29, 1975 totalled $7,746.46. The balance of the verdict thus was $7,605.44, the exact amount of the underpayment of Connie's ten percent entitlement as calculated by plaintiff's accountant treating the year-end payments as bonuses not salaries.

We reject defendants' contentions and hold the trial court properly admitted extrinsic evidence under the circumstances of this case. Parol evidence of prior or contemporaneous oral negotiations are generally inadmissible to alter, contradict, or explain the terms of a written instrument provided the document is complete, unambiguous, and unconditional. An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time. *Berry* v. *Klinger*, 225 Va. 201, 207, 300 S.E.2d 792, 796 (1983). Accordingly, when the parties set out the terms of their agreement in a clear and explicit writing, the document is the sole memorial of the contract and the sole evidence of the agreement. *Durham* v. *Pool Equipment Co.*, 205 Va. 441, 446, 138 S.E.2d 55, 59 (1964). A well-recognized exception to the parol evidence rule, however, is the partial integration doctrine. "Where the entire agreement has not been reduced to writing, parol evidence is admissible, not to contradict or vary its terms but to show additional independent facts contemporaneously agreed upon, in order to establish the entire contract

between the parties." *High Knob, Inc. v. Allen*, 205 Va. 503, 506, 138 S.E.2d 49, 52 (1964).

■ In this case, the contract sued upon is ambiguous in several important particulars; it is unclear and non-explicit, susceptible of being understood in more than one way, and, according to credible testimony that the jury was entitled to believe, failed to show additional independent facts contemporaneously agreed upon which bore on the actual agreement between the parties.

■ In our view, the terms "advisor" and "bonuses" in paragraph (1) are patently ambiguous. Defendants have implicitly conceded that extrinsic evidence was properly received to explain the meaning of "advisor." Thus, we will not dwell further on that ambiguity except to say that without a meaning attached to that word in the contract, there is no objective basis upon which to judge the performance of the plaintiff in order to determine whether he fulfilled his obligations under the agreement. In the context of the plumbing business, or any other business, one employed as an "advisor" may be expected to perform any number of duties. Therefore, this contract, which has that word as a crucial part, is incomplete without defining that term.

Likewise, given the intricate manner in which payment of the stock was to be handled in this transaction, the term "bonuses" is imprecise and utterly ambiguous. Connected with the understanding of that term is the difficulty of fully appreciating the scope of the deal without the benefit of parol testimony about how it actually was structured. The trier of fact must determine how goodwill, on one hand, and salary raises, on the other, were to be integrated in making the net-profit computation. Independent facts touching those subjects were essential to a proper understanding of the whole transaction.

■ Finally, having concluded that extrinsic evidence was properly admitted, we reject defendants' only other viable challenge to the verdict and judgment below. They claim the jury was misdirected. We have examined each challenged instruction, those given and those refused, and find no reversible error in the actions of the trial court.

Consequently, the judgment appealed from will be

*Affirmed.*