**C.F. TRUST, INC., Appellant,**

v.

**Robert O. TYLER, Trustee, Appellee.**

**No. 1:04CV759.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 16, 2004.

Harvey A. Levin, Birch, Horton, Bittner & Cherot, Washington, DC, for Appellant.

Steven B. Ramsdell, Tyler, Bartl, Gorman & Ramsdell PLC, Alexandria, VA, for Appellee.

## MEMORANDUM OPINION

ELLIS, District Judge.

At issue in this bankruptcy appeal is the bankruptcy judge's conclusion that a general release of claims executed in connection with the formation of a Chapter 11 plan was ambiguous, such that parol evidence was necessary to determine the parties' intent with respect to the scope of the release.

### I.

For the past decade, appellant C.F. Trust, Inc. has been seeking with little success to collect from Barrie Peterson more than $6 million owed on two commercial notes.[1] The latest chapter in this debt-collection saga began in November 1999 when C.F. Trust filed a diversity action in this district against Peterson, appellee First Flight Limited Partnership ("First Flight"), and other business entities seeking a declaratory judgment that First Flight and the other entities were Peterson's alter egos, and therefore that their assets could be used to satisfy his debts.[2] In addition to declaratory relief, C.F. Trust's complaint requested an award of attorneys' fees and costs.[3] After a four-

---

1. For a brief summary of the protracted litigation between plaintiff and Peterson, see *C.F. Trust, Inc. v. First Flight Limited Partnership,* 140 F.Supp.2d 628, 632 (E.D.Va.2001).

2. The other defendants in the case were Birchwood Organization, Inc., Birchwood Holdings Group, Inc., Maryland Air Industries, Inc., PVD Limited Partnership, Occoquan Limited Partnership, Carnett Commercial Investors, Inc., all of which were owned

by Barrie Peterson or members of his family, and Barrie Peterson himself. *See First Flight,* 140 F.Supp.2d at 630–31. Nancy and Scott Peterson, Barrie's wife and son, were also named as defendants, but prevailed on summary judgment prior to trial. *See id.* at 629 n. 2.

3. Under Virginia law, a prevailing plaintiff in a fraud action may receive attorneys' fees from the defendant at the chancellor's discre-

day bench trial, C.F. Trust prevailed against First Flight on a "reverse veil-piercing" theory and obtained its requested declaratory relief. *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 140 F.Supp.2d 628, 645 (E.D.Va.2001) [hereinafter *"First Flight"*]. A final ruling on C.F. Trust's claim for attorneys' fees and costs, however, was deferred pending resolution of any appeal. *Id.* at 645–46; *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 140 F.Supp.2d 628 (E.D.Va.2001) (Order).

In early 2001, shortly after the entry of judgment, First Flight appealed the *First Flight* decision to the Court of Appeals for the Fourth Circuit, which in turn certified to the Supreme Court of Virginia the question whether Virginia law recognizes a cause of action for reverse piercing of the corporate veil. *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 306 F.3d 126, 128 (4th Cir.2002). In June 2003, the Supreme Court of Virginia answered the certified question in the affirmative, holding that reverse veil-piercing was indeed cognizable under Virginia law. *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 266 Va. 3, 11, 580 S.E.2d 806, 810 (2003). As a result, the Fourth Circuit promptly affirmed the judgment against First Flight on this theory. *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 338 F.3d 316, 317 (4th Cir.2003).

While *First Flight* was winding its way through the appellate process, the parties were busy in another forum. In April 2001, Peterson filed for Chapter 11 bankruptcy in the Eastern District of Virginia, and C.F. Trust filed four proofs of claim against the bankruptcy estate shortly thereafter, including one for $885,836 for costs and attorneys' fees incurred in collecting on the commercial notes, and one for $9,808 for a contempt sanction obtained against Peterson in other litigation. The following year, in March 2002, C.F. Trust

filed a fifth proof of claim, this one for $179,000 for costs and attorneys' fees incurred in connection with the *First Flight* litigation.

On or about that time, Peterson filed his first Chapter 11 reorganization plan with the bankruptcy court. The bankruptcy court found that Peterson's proposed plan was filed in bad faith and accordingly declined to approve it. As a consequence of this bad-faith plan, Peterson's bankruptcy petition was converted to Chapter 7 in May 2002, and appellee Robert O. Tyler was appointed trustee of the bankruptcy estate.

In the summer of 2002, more than a year after Peterson's initial bankruptcy filing, the trustee, creditors of the bankruptcy estate, and various related parties began extensive negotiations concerning Peterson's repayment obligations and the means by which those obligations might be fulfilled. Both C.F. Trust and First Flight participated in these negotiations. By the end of the summer, C.F. Trust had agreed to reduce the combined amount of its $885,836 and $9,808 claims by $350,000 in exchange for the prompt sale of and distribution of proceeds from a parcel of real property in Nantucket, Massachusetts belonging to Peterson. Accordingly, in September 2002, with the consent of the parties to the bankruptcy, the bankruptcy court issued an order noting, "As a condition of the sale, and its receipt of no less than $2.5 million from the proceeds, C.F. Trust, Inc. has agreed to reduce its currently allowed unsecured claim of $895,644 by $350,000 to $545,644, provided that C.F. Trust did not agree to reduce any other sum (should its allowed unsecured claim be otherwise disallowed or reduced for any reason)." *In re Peterson,* Case

tion. *See Prospect Dev. Co., Inc. v. Bershader,* 258 Va. 75, 515 S.E.2d 291, 301 (1999).

No. 01–11529–RGM (Bankr.E.D.Va. Sept. 24, 2002) (Order).

Negotiations continued through the remainder of 2002, and by January 2003—with the *First Flight* appeal still pending—the parties had reached a series of agreements, memorialized in a "Term Sheet," that permitted Peterson's bankruptcy petition to be reconverted to Chapter 11. In one of the agreements, First Flight agreed to commit a substantial portion of its cash flow[4] to Peterson's bankruptcy estate, thus providing a means of paying Peterson's debts, including the debts to C.F. Trust, and avoiding the risk that First Flight might need to be liquidated. Under another of the agreements, the parties to the bankruptcy—including C.F. Trust and First Flight—agreed to waive certain of their claims against one another to facilitate resolution of the bankruptcy process. From these Term Sheet agreements came a new Chapter 11 reorganization plan ("the Plan"), which the trustee[5] submitted to creditors of the estate in February 2003, and shortly thereafter to the bankruptcy court. Notably, neither the Plan itself nor the disclosure statement that accompanied it mentioned C.F. Trust's claim for $179,000 in costs and attorneys' fees from the *First Flight* litigation.

Then, on March 18, 2003, two important events occurred. First, the bankruptcy court approved the Plan. *In re Peterson*, Case No. 01–11529–RGM (Bankr.E.D.Va. March 18, 2003) (Order). Second, the parties executed the Settlement Agreement and Release ("the Release"), which formalized and made specific the waiver of claims to which the parties, in principle, had agreed when compiling the Term Sheet. The Release arranges the parties to the bankruptcy into three groups: (i) "the C.F. Trust Parties"; (ii) the trustee and (iii) "the Scott Peterson Parties," including First Flight.[6] The Release then proceeds to provide for two reciprocal releases of claims, the first between the Scott Peterson Parties and the bankruptcy estate, and the second between the Scott Peterson Parties and the C.F. Trust Parties.[7] Importantly, however, the latter release is subject to exceptions that are the focus of the present controversy. Specifically, Paragraph 8, "Exceptions to Release" provides that:

Notwithstanding any other provisions of this Settlement Agreement and Release:

(a) the C.F. Trust Parties and the Trustee do not release First Flight Limited Partnership from any lien, charging orders or execution arising out of judgments held by the C.F. Trust Parties against Barrie M. Peterson, such lien rights to be expressly preserved;

(b) the C.F. Trust Parties and the Trustee do not release First Flight Limited Partnership from any obligation incurred by First Flight pursuant to the terms of the Chapter 11 Plan of Reorganization, as confirmed by the

---

4. First Flight owns and operates a commercial/industrial rental property in Hagerstown, Maryland known as the Top Flight Airpark. *See First Flight*, 140 F.Supp.2d at 630.

5. Tyler, the Chapter 7 trustee, was appointed the Chapter 11 trustee in February 2003 following the reconversion of Peterson's petition. *See In re Peterson*, Case No. 01–11529–RGM, slip op. at 2 (Bankr.E.D. Va. June 7, 2004) (Memorandum Opinion).

6. The Scott Peterson Parties are principally composed of business entities like First Flight that are owned or controlled by Barrie Peterson or his family members.

7. Unlike the Scott Peterson Parties, the C.F. Trust Parties did not relinquish any claims against the bankruptcy estate under the Release.

Bankruptcy Court, or any other instruments executed to implement the Plan of Reorganization; and

(c) the judgment in *C.F. Trust, Inc., et al. v. First Flight Limited Partnership, et al.,* 140 F.Supp.2d 628 (E.D.Va.2001), *questions certified,* 306 F.3d 126 (4th Cir.2002), *appeal pending,* Record No. 022212 (Va. Sup.Ct.), shall not be released, the pending litigation shall not be dismissed, and the rights of the parties with respect thereto shall be preserved; provided, however, that any judicial decisions in this litigation shall not diminish or otherwise adversely alter the parties' obligations, including obligations with respect to the availability and use of First Flight's cash from operations, under the terms of the Chapter 11 Plan of Reorganization, as confirmed by the Bankruptcy Court, or any other instruments executed to implement the Plan of Reorganization.

In July 2003, approximately four months after the execution of the Release and confirmation of the Plan, the Fourth Circuit upheld C.F. Trust's reverse veil-piercing claim and affirmed the *First Flight* judgment. *See C.F. Trust, Inc. v. First Flight Ltd. P'ship,* 338 F.3d 316, 317 (4th Cir.2003). In light of this result, C.F. Trust renewed here the claim for attorneys' fees and costs incurred in the *First Flight* litigation that had been deferred pending disposition of the appeal. The trustee responded by filing a motion in the bankruptcy court for an order requiring C.F. Trust to show cause why it should not be held in contempt for attempting to enlarge its claims against Peterson and First Flight in violation of § 1141(a) of the Bankruptcy Code, which states that the provisions of a confirmed plan bind all

creditors. *See* 11 U.S.C. § 1141(a) (2004). Consequently, judgment on C.F. Trust's claim for attorneys' fees and costs from the *First Flight* litigation was again deferred here, this time pending a determination by the bankruptcy court whether the Plan or any related agreement precluded a separate award of attorneys' fees and costs against First Flight. *C.F. Trust, Inc. v. First Flight Ltd. P'ship,* Case No. 1:99cv1742 (E.D.Va. Nov. 7, 2003) (Order).

In briefs and argument presented to the bankruptcy judge in January 2004, C.F. Trust emphasized that its claim for fees and costs was directed against First Flight, not Peterson, and was based on First Flight's participation in Peterson's scheme to hinder the collection of his debts.[8] From this premise, C.F. Trust argued that First Flight was independently—rather than derivatively—liable for the *First Flight* fees and costs, and, consequently, that the settling of Peterson's obligations through the Plan did not release First Flight from its claim for those fees and costs. Nor, C.F. Trust continued, did the Release itself release First Flight from that claim because the Release included an exception for "the pending litigation" between C.F. Trust and First Flight. The trustee and First Flight, however, argued for a different reading of the "Exceptions to Release." Citing the portion of Paragraph 8(c) stating, "any judicial decisions in this litigation shall not diminish or otherwise adversely alter the parties' obligations," the trustee and First Flight contended that Paragraph 8(c) was not intended to preserve any claims that might have the effect of increasing First Flight's liabilities, but merely the question of law then on appeal before the Fourth Circuit, *i.e.,* whether Virginia law recognized a claim for reverse-piercing of the

---

**8.** *See First Flight,* 140 F.Supp.2d at 633–636, 642–45; *Bershader,* 515 S.E.2d at 301.

corporate veil. Further, the trustee and First Flight contended that C.F. Trust's claim for the *First Flight* fees and costs had been subsumed within its $545,644 allowed claim under the Plan and thus compromised and settled during the Term Sheet negotiations.

By order dated January 8, 2004, the bankruptcy court held that the Release was "ambiguous with respect to the issue of whether C.F. Trust, Inc., settled all claims against Barrie M. Peterson and [First Flight], which settlement would preclude the award of further attorneys' fees in [*First Flight*], now pending in the United States District Court of the Eastern District of Virginia."[9] *In re Peterson*, Case No. 01–11529–RGM (Bankr.E.D.Va. Jan. 8, 2004) (Order). Accordingly, the bankruptcy court ordered an evidentiary hearing on the question of the parties' intent with respect to whether the Release included C.F. Trust's claim for the *First Flight* attorneys' fees and costs. *See id.* At the hearing in May 2004, documents were introduced and the following persons testified: Tyler, the trustee; Bruce Henry, counsel for Peterson; Russell Gaspar, counsel for First Flight; and William Cooley, Vice President for C.F. Trust. *See In re Peterson*, Case No. 01–11529–RGM, slip op. at 8 (Bankr.E.D. Va. June 7, 2004) (Memorandum Opinion). While it appears that no party presented direct evidence of prior or contemporaneous *expressed* intent

regarding the Release's effect on C.F. Trust's claim for attorneys' fees and costs, the record reflects that each party introduced some evidence of his own understanding on that point. The trustee, for example, testified that he understood Paragraph 8(c) to preserve only the question whether First Flight could be held liable for Peterson's debts on a reverse-veil piercing theory, noting that if he had understood Paragraph 8(c) also to preserve C.F. Trust's claim for fees and costs, he would have included that claim among First Flight's liabilities in the disclosure statement that he sent to Peterson's creditors in February 2003.[10] *Id.* at 13–14. The trustee also noted that no provision had been made for C.F. Trust's claim for fees and costs in First Flight's cash flow projections, and that the success of the Plan might be jeopardized were First Flight forced to pay that claim. *Id.* Finally, the trustee testified that it was his understanding during negotiations that "all matters were on the table," and that "[e]verything that could raised had been raised and had been resolved." *Id.* at 14. Henry and Gaspar testified to a similar understanding, and while they did not testify that the parties explicitly discussed and agreed that the *First Flight* fees and costs would be released, they did introduce notes taken during negotiations purporting to show "that the issue of attorney's [sic] fees was raised and discussed." *Id.* Only

**9.** The bankruptcy court also found the Plan ambiguous on that point, noting that it seemed unclear whether C.F. Trust's claim for the *First Flight* attorneys' fees and costs was subsumed within its $545,644 allowed claim under the Plan and thus settled. *See In re Peterson*, Case No. 01–11529–RGM (Bankr. E.D.Va. Jan. 8, 2004) (Order); Record at 120, *In re Peterson*, Case No. 01–11529–RGM (Bankr.E.D.Va. Jan. 15, 2004) (No. 585). The record convincingly reflects, however, that the amount of C.F. Trust's allowed claim under the Plan was determined simply by sub-

tracting $350,000 from the sum of C.F. Trust's $885,836 and $9,808 proofs of claim, without reference to C.F. Trust's $179,000 proof of claim for the *First Flight* attorneys' fees and costs.

**10.** The disclosure statement distributed along with a proposed plan of reorganization must contain "adequate information ... that would enable a hypothetical reasonable investor ... to make an informed judgment about the plan." 11 U.S.C. § 1125 (2004).

Cooley testified to a contrary understanding, stating emphatically that C.F. Trust did not intend for the Release to settle the issue of attorneys' fees and costs, and that the preservation of such fees and costs was a "deal breaker" to C.F. Trust. *Id.* at 15.

In a Memorandum Opinion dated June 7, 2004, the bankruptcy court held that C.F. Trust's claim against First Flight for the *First Flight* fees and costs was barred. *Id.* at 19. In reaching this conclusion, the bankruptcy court relied heavily on the trustee's February 2003 disclosure statement, which reads, in part:

> [The Term Sheet] provides that "pending litigation (is) to be stayed, except FF appeal," obviously referring to litigation pending between the parties who signed [the Term Sheet]. Resolution of the "FF Appeal" which involves a point of law certified by the U.S. Fourth Circuit Court of Appeals to the Virginia Supreme Court, will have no impact on the Disclosure Statement or the accompanying Plan.

*Id.* at 13. In the bankruptcy court's view, the clauses stating that the appeal "involve[d] a point of law," and would "have no impact on ... the accompanying Plan," were consistent with the understanding of the trustee, Henry, and Gaspar that the purpose of Paragraph 8(c) was merely to preserve the question whether First Flight could be held liable for Peterson's debts under a reverse veil-piercing theory, and that resolution of the appeal—in either C.F. Trust's or First Flight's favor—was not intended "to affect any of the parties' rights or obligations under the settlement itself." *Id.* at 13–14. Accordingly, the bankruptcy court found that all of the parties, including C.F. Trust, understood and accepted that "prosecuting the appeal would have no monetary effect on the plan," *id.* at 14, and that the one exception to the "mutual, general releases among all

of the parties ... was the [*First Flight*] appeal," *id.* at 15. Thus, the bankruptcy court concluded, C.F. Trust's claim against First Flight for the *First Flight* attorneys' fees and costs had been waived by the execution of the Release. *Id.* at 16–19.

This appeal followed.

## II.

■ A threshold question in this appeal is the appropriate standard of review. Under the Bankruptcy Code, the standard of review applied to bankruptcy appeals depends on the nature of the matter reviewed. Decisions of a bankruptcy judge on "core" bankruptcy matters are reviewed under a clear error standard for findings of fact and a *de novo* standard for conclusions of law. *See* Fed. R. Bank. P. 8013; *Canal Corp. v. Finnman,* 960 F.2d 396, 399 (4th Cir.1992). With respect to "non-core" or "related" matters, however, a bankruptcy judge can only make proposed findings of fact and conclusions of law, both of which are subject to *de novo* review by the district court. *See* 28 U.S.C. § 157(c)(1) (2004); *Humboldt Express, Inc. v. Wise Co.,* 190 F.3d 624, 631 (4th Cir.1999). The standard of review for this appeal, therefore, depends on whether the proceeding in the bankruptcy court relating to the construction of the Release was core or non-core.

■ Whether a proceeding is core or non-core depends, in turn, on the nature of the proceeding and its relationship to the bankruptcy process. *See In re S.G. Phillips Constructors, Inc.,* 45 F.3d 702, 707 (2d Cir.1995). The term "core" has its origins in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), which held unconstitutional the jurisdictional provisions of the Bankruptcy Reform Act of 1978 because they permitted non-Article III bankruptcy judges to de-

cide matters outside of "the core of the federal bankruptcy power," *i.e.*, matters not inherent in "the restructuring of debtor-creditor relations." *Id.* at 71, 102 S.Ct. 2858. Specifically at issue in that case were various common-law claims, including breach of contract and warranty, brought by the debtor in the bankruptcy court against a defendant otherwise uninvolved in the bankruptcy. *Id.* at 56, 102 S.Ct. 2858. In separate opinions, a four-justice plurality and two justices concurring in the judgment agreed that because the plaintiff's claims arose "entirely under state law," and involved "no federal rule of decision," they could not be adjudicated by a judge lacking Article III status. *Id.* at 90, 102 S.Ct. 2858. Congress responded to *Marathon* by codifying the core/non-core distinction, granting bankruptcy judges the power to "hear and determine ... all core proceedings" but only to make proposed findings of fact and conclusions of law for matters merely "related to" the bankruptcy process. 28 U.S.C. § 157(b)(1), (c)(1) (2004).

While the amended statute does not define "core proceedings," it sets forth a non-exhaustive list of fifteen examples of matters falling within that description, including "matters concerning the administration of the estate," "objections to discharges," "confirmations of plans," and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship." 28 U.S.C. § 157(b)(2) (2004). The breadth of matters encompassed by these examples suggests, and courts construing the amended statute have confirmed, that "Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits," as established by *Marathon*. *In re Arnold Print Works*, 815 F.2d 165, 168 (1st Cir.

1987); *see also S.G. Phillips*, 45 F.3d at 705. *Marathon*, in turn, has been narrowly interpreted. *See, e.g., Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Accordingly, included within the "core" category have been such varied matters as a post-confirmation dispute between creditors regarding a pre-bankruptcy subordination agreement, *In re Best Prods. Co.*, 68 F.3d 26, 33 (2d Cir.1995), a post-petition state-law claim by the debtor against a defendant not otherwise involved in the bankruptcy, *Arnold Print Works*, 815 F.2d at 168, and a lease dispute between two non-debtors arising out of a bankruptcy sale, *In re Petrie Retail, Inc.*, 304 F.3d 223, 228 (2d Cir. 2002). From these precedents can be discerned the principle, expressed in different ways by different courts, that any proceeding dependent on bankruptcy for its existence is a core bankruptcy proceeding. *Compare In re United States Lines*, 197 F.3d 631, 637 (2d Cir.1999) ("Whether a contract proceeding is core depends on ... the degree to which the proceeding is independent of the reorganization.") *with In re Wood*, 825 F.2d 90, 97 (5th Cir.1987) ("a proceeding is core ... if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").

Applied to this case, these principles point persuasively to the conclusion that the trustee's motion for a show cause order under § 1141(a) was a core bankruptcy matter. Particularly instructive on this point is *Petrie Retail*, which, as here, involved a post-confirmation motion under § 1141(a) designed to preclude a lawsuit in another forum. *Petrie Retail*, 304 F.3d at 227. The movant in *Petrie Retail*, Marianne Corp., had acquired lease rights from the debtor in a bankruptcy sale the terms of which stated that Marianne would

not assume pre-existing liabilities such as unpaid rent. *Id.* at 226. When Luan Corp., Marianne's new landlord, sued Marianne in state court for back rent on which the debtor had defaulted, Marianne moved in the bankruptcy court pursuant to § 1141(a) for "an order in aid of consummation of the Plan" enforcing the terms of the bankruptcy sale. *Id.* at 227. Over Luan's objection that its claim for back rent was "a post-sale contract dispute between two non-debtors," and therefore non-core, the *Petrie Retail* court held that Marianne's motion was a core matter because the motion was based on rights established by the "sale order, plan of reorganization, and confirmation order," and because it "sought enforcement of a pre-existing injunction issued as part of a bankruptcy court's sale order and confirmation order," noting that "[a] bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." *Id.* at 229–230.

Like the sale order in *Petrie Retail,* the Release here is an integral and inseparable component of the Plan. The trustee's motion, therefore, depends on Peterson's bankruptcy for its existence and is thus a core proceeding. While C.F. Trust's claim against First Flight for the *First Flight* fees and costs arose independently of Peterson's bankruptcy and is not itself a core matter, this was not the claim before the bankruptcy court. Rather, the question the bankruptcy court resolved was whether the Plan and related agreements, including the Release, barred the claim for fees. *See In re Peterson,* Case No. 01–11529–RGM, slip op. at 2 (Bankr.E.D. Va. June 7, 2004) (Memorandum Opinion). This narrower question is plainly a core matter as the Release is integral to the Plan. In other words, whether fees and costs should be awarded to C.F. Trust in

the *First Flight* case, together with the proper amount of those fees and costs, is a non-core matter to be resolved by the district court in the context of the *First Flight* case, but whether the Release, which was entered into in connection with the Plan, bars recovery of those fees from First Flight is a core matter to be determined in the first instance by the bankruptcy court in the context of Peterson's bankruptcy case. Accordingly, as in *Petrie Retail,* the trustee's § 1141(a) motion in this case was based on rights established as part of a reorganization plan, and the bankruptcy court thus retained plenary jurisdiction over the motion as a core matter.

■ With that established, it is clear that this appeal is governed by a "clearly erroneous" standard for findings of fact and a *de novo* standard for conclusions of law. *See Canal Corp.,* 960 F.2d at 399. It follows that the bankruptcy judge's conclusion that the language of the Release is ambiguous is subject to *de novo* review. *See Doswell Ltd. P'ship v. Virginia Elec. & Power Co.,* 251 Va. 215, 468 S.E.2d 84, 88 (1996) ("The question whether an agreement is ambiguous is not one of fact but one of law . . . ."). The more deferential "clearly erroneous" standard applies to review of the bankruptcy judge's factual findings based on the parol evidence.

### III.

■ As stated at the outset, the principal question in this appeal is whether the bankruptcy judge erred in holding the Release ambiguous with respect to the scope of claims preserved, and in admitting parol evidence to determine whether C.F. Trust had released its claim against First Flight for attorneys' fees and costs from the *First Flight* litigation. This question is governed by the parol evidence

rule. The general rule, not just in Virginia, but in virtually all American courts, is that where parties to a contract have reduced their agreement to a writing, if that writing, construed as a whole, is plain and unambiguous in its meaning, evidence of prior or contemporaneous agreements or negotiations is inadmissible to vary or contradict that meaning. *See* 29A AM. JUR. 2D *Evidence* §§ 1092, 1100 (1994); RESTATEMENT (SECOND) OF CONTRACTS § 215 (1981); *Eure v. Norfolk Shipbuilding & Drydock Corp. Inc.*, 263 Va. 624, 561 S.E.2d 663, 667 (2002); *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 225 Va. 508, 303 S.E.2d 894, 898 (1983). One well-established exception to the general rule is that where a writing reflecting an agreement is infected with a genuine ambiguity, parol evidence of prior or contemporaneous agreements or negotiations may be received as an aid to determining the parties' intent as to the contractual language at issue. *See* 29A AM. JUR. 2D *Evidence* § 1140 (1994) ("Evidence of previous negotiations between the parties to an ambiguous written agreement may be admitted to the extent that such evidence sheds light on how the parties understood the terms of the agreement."); *Eure*, 561 S.E.2d at 667–68. But importantly, the law is clear that contract terms in a writing are not ambiguous merely because the parties to a lawsuit disagree about their meaning. *See Eure*, 561 S.E.2d at 668; *Wilson v. Holyfield*, 227 Va. 184, 313 S.E.2d 396, 398 (1984). Were this not the case, the ambiguity exception to the parol evidence rule would swallow the rule itself for it would be a rare case that lawyers could not claim to see ambiguity in the clearest language. After all, constructing and exploiting ambiguities, and indeed deconstructing writings, has become the stock in trade for many lawyers. To avoid having the ambiguity exception swallow the general rule, the law considers that a writing is not ambiguous under the parol evidence rule unless settled rules of interpretation, applied to the writing as a whole, leave a genuine uncertainty as to which of two or more possible meanings represents the contracting parties' true intent. *See* 29A AM. JUR. 2D *Evidence* § 1138 (1994).[11] Thus, if the words chosen by the parties have an ordinary, plain meaning, the parol evidence inquiry is ended; parol evidence is inadmissible, as lawyers' clever and sophistical arguments will not suffice to overcome the words' plain meaning. And finally, it is important to note that whether a contract writing is ambiguous is a question of law for the court. *See Doswell*, 468 S.E.2d at 88.

The writing at issue here, Paragraph 8(c) states, in relevant part:

> the judgment in *C.F. Trust, Inc., et al. v. First Flight Limited Partnership, et al.*, 140 F.Supp.2d 628 (E.D.Va.2001), *questions certified*, 306 F.3d 126 (4th Cir. 2002), *appeal pending*, Record No. 022212 (Va.Sup.Ct.), shall not be released, the pending litigation shall not be dismissed, and the rights of the parties with respect thereto shall be preserved . . . .

Analysis of this passage begins by noting the parties' agreement on two points. First, the parties agree that the operative provision of Paragraph 8(c) is the clause, "the rights of the parties with respect thereto shall be preserved." Second, the parties also agree that the phrase, "with respect thereto," refers to "the pending litigation." Thus, the parties correctly agree that Paragraph 8(c) operates to pre-

---

11. In setting this high standard for finding ambiguity, the law of contract appropriately recognizes that a lower standard would undermine the power of language to do its job, namely to express the parties' intent.

serve and except from the Release all of C.F. Trust's rights with respect to the pending litigation. It is at this point that the parties' positions diverge. Appellees Tyler and First Flight contend that the phrase, "the pending litigation," refers solely to the appeal then pending before the Court of Appeals for the Fourth Circuit, and consequently that "the rights of the parties with respect thereto" encompasses only the parties' rights with respect to that appeal, not their rights in the *First Flight* judgment itself. C.F. Trust, conversely, contends that "the pending litigation" refers to all matters then pending in the *First Flight* case in both the Court of Appeals and the district court, including the question specifically left open in the district court, namely whether C.F. Trust should recover fees and costs from First Flight as a prevailing party. *See First Flight*, 140 F.Supp.2d at 646; *see also Prospect Dev. Co., Inc. v. Bershader*, 258 Va. 75, 515 S.E.2d 291, 301 (1999) (holding as a matter of Virginia law that prevailing fraud plaintiffs may recover attorneys' fees). In light of this disagreement, the bankruptcy court found Paragraph 8(c) ambiguous and admitted parol evidence on the question whether the parties intended that C.F. Trust's claim for fees and costs from *First Flight* would be preserved. Accordingly, this appeal turns on whether "the pending litigation" has a clear and unambiguous meaning in the context of Paragraph 8(c) and the Release in general, and, if so, whether that meaning preserves C.F. Trust's claim for attorneys' fees and costs against First Flight.

On close examination, it becomes quite apparent that any so-called ambiguity in Paragraph 8(c) is nothing more than the product of lawyers' artful sophistry. The

clause, "the pending litigation shall not be dismissed," is not qualified or limited in any way, and thus plainly encompasses all matters that were then "pending" in the *First Flight* case, whether in the Court of Appeals or the district court, including C.F. Trust's petition for attorneys' fees and costs. This is the plain and ordinary meaning of the phrase; a more restrictive meaning finds no warrant in the phrase's language—language, it is worth recalling, that was chosen by lawyers who presumably had a clear understanding of its technical meaning and effect in that context. Had the parties intended to release C.F. Trust's claim for the *First Flight* fees and costs, they had ample resources of clear language to express this intent.

An examination of the individual terms in the clause underscores the lack of ambiguity. A "litigation" is simply a law case, here the *First Flight* case, and a law case is "pending" if it remains unresolved. Further, law cases are not infrequently pending simultaneously in the appellate court and in the district court when, as here, issues left pending in the district court are explicitly left to be resolved there following disposition of the appeal.[12] This plain meaning of the phrase "the pending litigation" is further reflected in Paragraph 8(c)'s clear statement that "the judgment in [*First Flight*] shall not be released." Inherent in that judgment is C.F. Trust's right to pursue its claim in the district court for fees and costs in the *First Flight* case. *See First Flight*, 140 F.Supp.2d at 646; *First Flight*, 140 F.Supp.2d 628 (E.D.Va.2001) (Order). In sum, the parties chose language that clearly and unambiguously reflects an intent to preserve C.F. Trust's right to pursue in

---

12. This situation typically occurs when, as here, district courts, to preserve judicial resources, sensibly elect to postpone resolution of a disputed fee claim pending an appeal.

The time-consuming effort required to resolve the fee dispute is undertaken only when the appeal confirms the necessity for doing so.

the district court its claim for fees and costs in connection with the *First Flight* judgment in the event that judgment were to be upheld, as it was.

Appellees, seeking to avoid this result, mistakenly point to the case citation identifying the *First Flight* judgment in Paragraph 8(c), *i.e.,* "140 F.Supp.2d 628 (E.D.Va.2001), *questions certified,* 306 F.3d 126 (4th Cir.2002), *appeal pending,* Record No. 022212 (Va.Sup.Ct.) ...." They argue that because that citation refers to the appeal before the Fourth Circuit, "the pending litigation" phrase in the clause that follows should be read as limited solely to the appeal. Yet, the fact that the drafters of Paragraph 8(c) made reference to the appeal in the citation indicates only that they accurately followed accepted rules of case citation by including the *First Flight* decision's subsequent history; it does not indicate that the citation refers to anything beyond the *First Flight* decision itself. *See* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 10.7, at 68 (Columbia Law Review Ass'n et al. eds., 17th ed.2000). Accordingly, the argument that the case citation in Paragraph 8(c) can be read to qualify the subsequent phrase, "the pending litigation," attributes to the citation a meaning that it does not possess, and improperly limits the plain meaning of the words the parties chose.

Moreover, even if appellees were correct that "the pending litigation" could reasonably be read to refer exclusively to the judgment on appeal to the Fourth Circuit, such a construction would avail them nothing. This is so because the plain and ordinary meaning of "the rights of the parties with respect [ ]to [the appeal]" encompasses any and all rights or claims contingent on the outcome of the appeal. As a right created by the *First Flight* judgment, C.F. Trust's right to seek attorneys' fees and costs is one such contingent right, and thus would fall within Paragraph 8(c)'s protections even under the restrictive reading of "the pending litigation" urged by appellees. What appellees apparently have in mind, but do not state, is that "the rights of the parties with respect [ ]to" "the pending litigation" should be construed to mean "issues that are the subject of the appeal before the Fourth Circuit." This strained construction has no basis in the plain language of Paragraph 8(c), which makes no reference to particular issues but instead simply preserves rights in "the pending litigation." Had the drafters of Paragraph 8(c)—most if not all of whom were attorneys—intended to exclude the right to seek fees and costs from the rights preserved under the Release, they were more than capable of doing so.

In their argument that Paragraph 8(c) is ambiguous, appellees next point to the language that immediately follows the rights-preserving provision noted above:

> provided, however, that any judicial decisions in this litigation shall not diminish or otherwise adversely alter the parties' obligations, including obligations with respect to the availability and use of First Flight's cash from operations, under the terms of the Chapter 11 Plan of Reorganization, as confirmed by the Bankruptcy Court, or any other instruments executed to implement the Plan of Reorganization.

In appellees' view, the phrase "shall not ... adversely alter the parties' obligations" can be read to require that "any decision in the [*First Flight*] litigation ... be neutral with respect to what First Flight was obligated to pay to or for the benefit of C.F. Trust," thereby foreclosing any claim by C.F. Trust against First Flight outside of the Plan. Appellee First Flight Br. of Opp. at 9. This reading, however, is contradicted by the fact that

"obligations" in Paragraph 8(c) is followed by the qualifier "under the terms of the Chapter 11 Plan." If C.F. Trust succeeds in holding First Flight liable for the *First Flight* attorneys' fees and costs, this liability will not be an "obligation . . . under the terms of the Chapter 11 Plan," but rather an obligation independent of the Plan. First Flight's bankruptcy obligations will remain unchanged. Moreover, the qualifier makes apparent that the purpose of the above-cited provision is not, as appellees claim, to limit First Flight's total liability to that provided for under the Plan,[13] but rather to ensure that First Flight would not be released from its obligations under the Plan if the *First Flight* judgment were reversed by the Court of Appeals.

This reading of Paragraph 8(c) is perfectly consistent with the apparent purpose of Paragraph 8 as a whole, which is to preserve, not limit, C.F. Trust's options for securing repayment from _First Flight, both under the Plan and outside of it. Paragraph 8, "Exceptions to Release," is in three parts, each of which preserves some portion of First Flight's actual or potential liabilities to C.F. Trust. First, Paragraph 8(a) states that First Flight is not released from "any lien, charging order or execution arising out of judgments held by the C.F. Trust Parties against Barrie Peterson, such lien rights to be expressly preserved." The manifest purpose of this language is to preserve C.F. Trust's right to turn to First Flight to satisfy the debts of Barrie Peterson in the event that the Plan fails and C.F. Trust is unable to obtain repayment of Peterson's debts through the

bankruptcy process. Second, Paragraph 8(b) states that First Flight is not released "from any obligation . . . pursuant to the terms of the Chapter 11 Plan of Reorganization . . . or any other instruments executed to implement the Plan of Reorganization." This provision protects C.F. Trust's rights under the Plan by ensuring that First Flight—the source of the funding for the Plan—is not released from its payment obligations under the Plan by the mere execution of the Release. Third and finally, Paragraph 8(c) preserves C.F. Trust's rights in the *First Flight* judgment, subject only to the possibility of reversal on appeal. Read together, these provisions appear to leave no stone unturned; they reflect a comprehensive plan to protect C.F. Trust's means of securing repayment from First Flight by preserving (i) all of First Flight's then-existing judgment liabilities (Paragraph 8(c)), (ii) all of First Flight's liabilities under the Plan (Paragraph 8(b)), and (iii) any potential future liabilities of First Flight arising from Peterson's debts (Paragraph 8(a)). Paragraph 8 thus carves out from an otherwise universal release of claims between C.F. Trust and the Scott Peterson Parties an exception for C.F. Trust's rights vis-a-vis First Flight. In sum, the comprehensive nature of Paragraph 8 points convincingly away from a finding that any of First Flight's liabilities to C.F. Trust are released.

■ Appellees' final argument is that even if Paragraph 8(c) is unambiguous, it

---

**13.** In this regard, and with respect to any concern that the *First Flight* fees and costs would threaten the integrity of the Plan, it is worth noting that the Plan is based on a projected gross annual income for First Flight in excess of $4,000,000, and that the disclosure statement anticipates First Flight paying Peterson and his wholly-owned management company more than $400,000 annually over

the life of the Plan. It is highly unlikely, therefore, that adding C.F. Trust's claim for the *First Flight* attorneys' fees and costs, valued between $180,000 and $300,000, to First Flight's liabilities will jeopardize Plan success, particularly in light of C.F. Trust's representation that it will not seek payment of that claim until all allowed claims under the Plan are paid in full, or the Plan fails.

cannot be read to preserve C.F. Trust's claim for attorneys' fees because that claim was not part of the *First Flight* judgment. Citing various cases stating that a request for attorneys' fees is an ancillary matter separate from the merits of the underlying litigation, *see, e.g., Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199–202, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), appellees contend that "the 'judgment' that was an exception to the [Release] was limited to the District Court's ruling on the merits of the litigation," and therefore that attorneys' fees are not preserved by Paragraph 8(c). Appellee First Flight Br. of Opp. at 17. This argument, however, flies directly in the face of the *First Flight* Memorandum Opinion and the Order entering judgment for C.F. Trust in that case, both of which expressly preserve C.F. Trust's right to pursue attorneys' fees pending the outcome of the appeal. *See First Flight*, 140 F.Supp.2d at 646 ("Plaintiffs also request attorneys' fees and costs. This request will be postponed pending resolution of any appeal of this matter."); *First Flight*, 140 F.Supp.2d 628 (E.D.Va. 2001) (Order) ("It is further ordered that plaintiffs' request for attorneys' fees and costs is deferred pending resolution of any appeal in this matter."). On a more fundamental level, appellees' argument also falls short by attempting to separate the rights created by a judgment from the judgment itself. The right of execution, for example, is inherent in every judgment; without it, the judgment itself is worthless. By appellees' logic, however, Paragraph 8(c) would not preserve C.F. Trust's right to execute on the *First Flight* judgment be-

cause execution occurs in a separate proceeding from that in which the merits are decided. Like the right of execution, the right to attorneys' fees is a right attendant to an underlying judgment, and therefore within the scope of Paragraph 8(c)'s protections.[14]

## IV.

Because Paragraph 8(c) unambiguously preserves C.F. Trust's right to seek attorneys' fees and costs from First Flight for the *First Flight* litigation, the bankruptcy court erred by admitting parol evidence on that question. Accordingly, it is unnecessary to consider whether the bankruptcy court's findings of fact with respect to that evidence were clearly erroneous.

Nonetheless, it is worth noting that the parol evidence considered by the bankruptcy court consisted—as often occurs in parol evidence cases—of the parties' *unexpressed* views of what was intended by the chosen language. The record reflects no evidence of a prior or contemporaneous writing or statement by any party to the others to the effect that Paragraph 8(c) was or was not intended to preserve C.F. Trust's claim for fees and costs in *First Flight*. As this case aptly demonstrates, the parol evidence rule's focus on the admissibility *vel non* of "prior or contemporaneous negotiations, dealings, events, or declarations"[15] is well-founded, given that evidence of unexpressed beliefs or views is rarely helpful in discerning the parties' intent with respect to the meaning of contractual terms; each party, as here, typi-

---

14. This does not constitute a holding that C.F. Trust is entitled to attorneys' fees from First Flight under the *Bershader* decision for having prevailed in *First Flight*. It merely establishes that if such a right exists, it was not waived by C.F. Trust's execution of the Release. *See First Flight*, 140 F.Supp.2d at 646 (leaving C.F. Trust's request for attorneys'

fees and costs undecided); *First Flight*, 140 F.Supp.2d 628 (E.D.Va.2001) (Order) (same).

15. 29A Am. Jur. 2D *Evidence* § 1140 (1994); *see also* Restatement (Second) of Contracts § 215 (1981) (discussing "prior or contemporaneous agreements or negotiations").

cally claims to have understood and intended the meaning that best suits its current position, and a court in such circumstances is left to choose between conflicting accounts that are difficult to distinguish from post-hoc rationalizations. As a result, the evidence the bankruptcy court most heavily relied on here—the disclosure statement—was not parol evidence at all, but rather part of the parties' agreement itself.[16]

### V.

The judgment of the bankruptcy court is vacated. An appropriate order will issue.

---

16. The statement here that the disclosure statement should not be considered parol evidence but rather part of the parties' agreement does not change the earlier conclusion that the Release unambiguously preserves C.F. Trust's claim for attorneys' fees and costs from *First Flight*. The passage from the disclosure statement stating that the outcome of the *First Flight* appeal would "have no impact" on the Plan is not inconsistent with the conclusion that Paragraph 8(c)'s plain lan-

guage preserves C.F. Trust's claim for the *First Flight* fees and costs, as the existence of that claim did not change any of the parties' obligations under the Plan itself.